**JOHN D. MUNDING, WSBA #21734**
**CRUMB & MUNDING, P.S.**
1610 W. Riverside Ave.
Spokane, WA 99201
Phone: 509-624-6464
john@mundinglaw.com

Attorneys for Defendants *Encore Capital*
*Group, Inc., Midland Funding, LLC, and*
*Midland Credit Management, Inc.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON AT SPOKANE

| | |
|---|---|
| KELLI GRAY, and all other similarly situated, | Case No. 2:09-cv-251-EFS |
| Plaintiffs, | (CONSOLIDATED CASE) |
| v. | **DECLARATION OF JOHN D. MUNDING IN SUPPORT OF DEFENDANTS MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING, LLC AND ENCORE CAPITAL GROUP, INC.'S SECOND MOTION FOR SUMMARY JUDGMENT** |
| SUTTELL & ASSOCIATES, *et. al.* | |
| Defendant. | |
| EVA LAUBER, DANE SCOTT, SCOTT BOOLEN, JOEL FINCH and all other similarly situated, | |
| Plaintiffs, | |
| v. | |
| ENCORE CAPITOL GROUP, INC., *et. al.* | |
| Defendants. | |

JOHN D. MUNDING hereby states under penalty of perjury under the laws of the United States that the following is true and correct:

1.    I am over the age of majority and a resident of Spokane, Washington, and I make this declaration of my own personal knowledge and am competent to testify to all the facts herein.

2.    I am President of the law firm of Crumb & Munding, P.S, and counsel to Defendants Midland Funding, LLC, and Midland Credit Management, Inc. I make this declaration based upon personal knowledge, publicly available documents, and my review of materials generated during the course of this litigation.

3.    Attached hereto as Exhibit "A" is a true and correct copy of the Washington Supreme Court decision *Gray v. Suttell*, No. 88414-5, filed for record August 28, 2014.

4.    Attached hereto as Exhibit "B" is a copy of the transcript of the Deposition Upon Oral Examination of Dane Alan Scott, taken June 10, 2011 at the instance of Defendants.

5.    Attached hereto as Exhibit "C" is a copy of the Order of Default Judgment entered in favor of Midland Funding, LLC against Dane Scott, in the total amount of $6,167.69, filed December 3, 2009 in the Superior Court of the State of Washington in and for the County of Benton, in *Midland Funding LLC v. Dane Scott*, Case No. 09-2-03235-9.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

EXECUTED this 7th day of August, 2015 in Spokane, Washington.

CRUMB & MUNDING, P.S.


    */s/ John D. Munding*
JOHN D. MUNDING, WSBA #21734
Attorneys for Defendants

# CERTIFICATE OF SERVICE

I, Blake A. Robertson the undersigned, hereby certify that on August 7, 2015, I electronically filed the foregoing Declaration of John D. Munding in Support of Second Motion for Summary Judgment with the Court using the Court's CM/ECF system, which will send notification of such filing to the following persons:

Bradley L Fisher
bradfisher@dwt.com,
barbaramcadams@dwt.com,
seadocket@dwt.com

Theodore W Seitz
tseitz@dykema.com

Kirk D Miller
kmiller@millerlawspokane.com

Michael David Kinkley
mkinkley@qwestoffice.net,
pleadings@qwestoffice.net,
pwittry@qwestoffice.net

CRUMB & MUNDING, P.S.

*/s/ Blake A. Robertson*
BLAKE A. ROBERTSON

# Exhibit "A"



**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 2 8 2014

_for_ CHIEF JUSTICE

This opinion was filed for record
at _Aug 8:00AM_ on _Aug 28, 2014_

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

CERTIFICATION FROM UNITED STATES
DISTRICT COURT FOR THE EASTERN
DISTRICT OF WASHINGTON IN

KELLI GRAY and all others similarly situated,

    Plaintiffs,

v.

SUTTELL & ASSOCIATES; MIDLAND
FUNDING, LLC; MARK T. CASE and JANE
DOE CASE, husband and wife; and KAREN
HAMMER and JOHN DOE HAMMER,

    Defendants.

— — — — — — — — — — — — — — — —

EVA LAUBER; DANE SCOTT; SCOTT
BOOLEN; JOEL FINCH; and all others
similarly situated,

    Petitioners,

v.

ENCORE CAPITAL GROUP, INC.; MIDLAND
FUNDING, LLC; MIDLAND CREDIT
MANAGEMENT, INC.; SUTTELL & HAMMER,
PS; MARK T. CASE and JANE DOE CASE,
husband and wife; MALISA L. GURULE and

No. 88414-5

En Banc

Filed    AUG 2 8 2014

JOHN DOE GURULE; KAREN HAMMER and    )
ISAAC HAMMER, wife and husband; WILLIAM )
SUTTELL and JANE DOE SUTTELL, husband )
and wife,                            )
                                     )
            Respondents.             )
                                     )
_____  )

WIGGINS, J.—In response to questions certified to this court, we hold that debt

buyers fall within the definition of "collection agency" under the Washington Collection

Agency Act (WCAA), chapter 19.16 RCW, when they solicit claims for collection.

Accordingly, if the court finds that Midland Funding LLC solicited claims, then Midland

Funding is a collection agency and it cannot file collection lawsuits without a license.

## ISSUES

The United States District Court for the Eastern District of Washington certified

the following questions to us:

1.    Does the definition of "collection agency" in RCW 19.16.100(2)[1]

      include a person who 1) purchases claims that are owed or due or

      asserted to be owed or due another, 2) undertakes no activity on said

      delinquent consumer account but rather contracts with an affiliated

      collection agency to collect the purchased claims, and 3) is the

---

[1] The definitions in this section were recently alphabetized pursuant to RCW 1.08.015(2)(k). LAWS OF 2013, ch. 148, §§ 1, 3. Accordingly, the definition of "collection agency" is now under RCW 19.16.100(4). However, this opinion cites to prealphabetized RCW 19.16.100 to ensure consistency with the briefs.

named plaintiff in a subsequent collection lawsuit for said purchased claims?

2.    Can a company, such as Midland Funding, LLC, file lawsuits in the [state of] Washington on delinquent consumer accounts without being licensed as a collection agency as defined by RCW 19.16.100(2)?

Certification from United States District Court for the Eastern District of Washington, No. CV-09-251-EFS consolidated with No. CV-10-5132-EFS (E.D. Wash. 2013).

## FACTS

This lawsuit involves two consolidated suits: *Gray v. Suttell & Assocs.*, No. CV-09-251-EFS (E.D. Wash.), and *Lauber v. Encore Capital Grp.*, No. CV-10-5132-EFS (E.D. Wash.).[2]  On April 8, 2011, plaintiffs filed an amended complaint, alleging claims under Washington's Consumer Protection Act (WCPA), chapter 19.86 RCW, and the federal Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p. These claims are based in part on plaintiffs' assertion that Midland Funding's business

---

[2] In the *Gray* lawsuit, Kelli Gray failed to pay for an item she ordered from Spiegel Brands Inc. Electronic Case File (ECF) 428, at 1.  Midland Funding purchased Gray's defaulted Spiegel account and assigned the account to its servicer, Midland Credit Management Inc. (MCM), which then turned the account over to Suttell & Associates, a law firm that filed a collection lawsuit against Gray in Spokane County Superior Court. *Id.* at 1-2.  On August 12, 2009, Gray filed her lawsuit, alleging that the Midland defendants and Suttell violated the federal Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p; Washington's Consumer Protection Act (WCPA), chapter 19.86 RCW; and the WCAA by serving and filing time-barred lawsuits, requesting unreasonable attorney fees, and acting as a collection agency without a license. ECF at 1-2.  On November 10, 2010, plaintiffs Eva Lauber, Dane Scott, Scott Boolen, and Joel Finch filed their putative class action on debt obligations that they failed to pay. *Id.* The *Lauber* plaintiffs' complaint similarly alleges violations of the FDCPA, WCPA, and WCAA based on the filing of affidavits in state court actions, and a license claim. *Id.* On December 29, 2010, the court consolidated the *Lauber* and *Gray* cases. *Id.*

arrangements and debt collection processes violated the WCAA. *See* RCW 19.16.440; *Evergreen Collectors v. Holt,* 60 Wn. App. 151, 155, 803 P.2d 10 (1991) (violation of WCAA is a per se violation of the CPA). The following chart illustrates the relationships between Midland Funding and its parent companies.

Encore Capital Group Inc. (publicly held corporation)

| Owns

Midland Credit Management Inc. (licensed collection agency)

| Owns

Midland Portfolio Services Inc. (owns 100% of Midland Funding)

| Owns

Midland Funding LLC (debt buying entity that owns the accounts)[3]

Midland Funding purchases defaulted receivables, i.e., consumers' unpaid financial commitments to credit originators such as banks, credit unions, consumer finance companies, commercial retailers, auto finance companies, and telecommunication companies. Midland Funding has no employees and is merely a holding company for the delinquent accounts it purchases.

Midland Credit Management (MCM) services the defaulted accounts on behalf of Midland Funding. Pursuant to the "Servicing Agreement," MCM decides how to collect on the defaulted accounts purchased by Midland Funding. MCM's employees manage the collection process and perform the collection acts for these defaulted accounts. MCM is licensed by the State of Washington as a collection agency. To fulfill its servicing duties, MCM contracts directly with Suttell & Associates, a law firm,

---

[3] Note that MCM, the collection agency, owns the "owner" of the accounts it is collecting.

to file collection lawsuits in Midland Funding's name. From 2005 to 2010, 1,082 cases were filed in Washington superior courts naming Midland Funding LLC as plaintiff.

Defendants Midland Funding and Suttell argue that prior to recent amendments to the WCAA, debt buyers did not fall within the definition of "collection agencies." Thus, Midland Funding did not need not to obtain a collection agency license. In February 2013, the federal district court certified the above questions to this court.

I.    Overview of Washington's Collection Agency Act

Both state and federal law regulate collection agencies. The WCAA, chapter 19.16 RCW, enacted in 1971, requires collection agencies to obtain a license, follow certain internal procedures, and adhere to a code of conduct. Prior to recent amendments, the WCAA defined "collection agency" as:

> (a) Any person **directly or indirectly engaged in soliciting claims for collection, or collecting or attempting to collect claims owed or due or asserted to be owed or due another person**;
>
> (b) Any person who directly or indirectly furnishes or attempts to furnish, sells, or offers to sell forms represented to be a collection system or scheme intended or calculated to be used to collect claims even though the forms direct the debtor to make payment to the creditor and even though the forms may be or are actually used by the creditor himself or herself in his or her own name;
>
> (c) Any person who in attempting to collect or in collecting his or her own claim uses a fictitious name or any name other than his or her own which would indicate to the debtor that a third person is collecting or attempting to collect such claim.

Former RCW 19.16.100(2) (2003) (emphasis added).[4]

---

[4] The drafters of the original 1971 bill included "factoring" agencies under the definition of collection agencies. That language did not survive the Senate Judiciary Committee's review. *See* Substitute S.B. 796, at 2, 42d Leg., 1st Ex. Sess. (Wash. Apr. 21, 1971) (on file with

A recent amendment, effective October 1, 2013, adds subsection (d) to this definition:

> (d) Any person or entity that is **engaged in the business of purchasing delinquent or charged off claims for collection purposes,** whether it collects the claims itself or hires a third party for collection or an attorney for litigation in order to collect such claims.

LAWS OF 2013, ch. 148, § 1 (emphasis added) (codified at RCW 19.16.100(2)(d)).

The federal FDCPA was enacted in 1977 to combat abusive debt collection practices. 15 U.S.C. § 1692. Some provisions of the WCAA parallel provisions of the FDCPA, but there are notable differences. For instance, the FDCPA regulates "'debt collector[s]'" as opposed to "collection agencies." 15 U.S.C. § 1692a(6). Because the FDCPA's definition of "debt collectors" differs from the WCAA's definition of "collection agency," we do not find courts' interpretations of the FDCPA definition instructive in this case.

II.    Overview of Debt Purchasing

Since the enactment of the WCAA, the debt collection industry has grown and changed to keep up with the increasing amount of consumer delinquent debt.[5] The

---

Wash. State Archives). Factoring consists of lending money to commercial clients, taking accounts receivable as security, and collecting upon those accounts. While factoring is a form of alternative financing to improve working capital, working with a collection agency is an attempt to recover old debt.

[5] As of November 2013, American consumers held over $800 billion of revolving, unsecured debt. *Consumer Credit – G.19: Current Release: June 2014*, BOARD OF GOVERNORS OF FED. RES. SYS., http://www.federalreserve.gov/releases/g19/Current/#table1 (release date Aug. 7, 2014). According to a 2009 government accountability office report, "[a]pproximately 6.6 percent of credit cards were 30 or more days past due in the first quarter of 2009—the highest [delinquency] rate in 18 years." U.S. Gov't Accountability Office, *Credit Cards: Fair Debt*

Federal Trade Commission noted that "'[t]he most significant change in the debt collection business in recent years has been the advent and growth of debt buying.'" FED. TRADE COMM'N, THE STRUCTURE AND PRACTICES OF THE DEBT BUYING INDUSTRY 1 (2013) (alteration in original) (quoting FED. TRADE COMM'N, COLLECTING CONSUMER DEBTS: THE CHALLENGE OF CHANGE 13 n.1 (2009)). Although a relatively new industry, by 2007, the debt collection industry employed over 200,000 people and reported annual revenue of $58 billion from consumer collections. RICK JURGENS & ROBERT J. HOBBS, NAT'L CONSUMER LAW CTR., THE DEBT MACHINE, HOW THE COLLECTION INDUSTRY HOUNDS CONSUMERS AND OVERWHELMS COURTS 5 (2010). A "debt buyer" is an entity or individual that purchases delinquent or charged-off debts from a creditor, usually for a fraction of the face value of the debt, and then takes some action to collect on those claims. H.B. REP. on SUBSTITUTE H.B. 1822, at 2, 63d Leg., Reg. Sess. (Wash. 2013).

There is growing concern that collection practices employed by debt buyers are harmful to consumers. A legislative staff summary of public testimony in support of the recent amendments reported:

> Many of the worst abuses in the debt collection industry are by debt buyers. Debt buyers purchase mass portfolios of charged off debt for pennies on the dollar, with little evidentiary basis, and get massive default judgments because the consumers have no notice of the lawsuit. Consumers have had to go to great lengths to rectify judgments based on fraudulent or paid-off claims that were sold to debt buyers who did not know they were buying illegitimate claims.

*Id.* at 3.

---

*Collection Practices Act Could Better Reflect the Evolving Debt Collection Marketplace and Use of Technology* 1 (2009), www.gao.gov/new.items/d09748.pdf.

Indeed, up to one-half of all purchased debt is resold several times over, which can make it difficult for the original debtor to recognize the debt because the collector is no longer the original creditor. FED. TRADE COMM'N, REPAIRING A BROKEN SYSTEM: PROTECTING CONSUMERS IN DEBT COLLECTION LITIGATION AND ARBITRATION 5 (2010). Responding to these concerns, the Washington State Legislature amended the WCAA in 2013 to explicitly reach debt buying entities. The issue here is whether the preamended definitions also cover debt buyers.

## ANALYSIS

Certified questions from federal court are questions of law that we review de novo. *Bradburn v. N. Cent. Reg'l Library Dist.,* 168 Wn.2d 789, 799, 231 P.3d 166 (2010). We consider the legal issues not in the abstract but based on the certified record provided by the federal court. *Id.* (citing RCW 2.60.030(2)). Once the court has decided to rule on a certified question pursuant to RCW 2.60.020, the ruling is not advisory but resolves actual issues pending in the federal proceeding and will be legal precedent in all future controversies involving the same legal question. *In re Elliott,* 74 Wn.2d 600, 446 P.2d 347 (1968).

Here, we hold that debt buyers are collection agencies under the WCAA when they solicit claims for collection. Accordingly, if Midland Funding solicits claims for collection, it is a collection agency and may not file collection lawsuits in Washington without a license. RCW 19.16.110 (no person shall act as a collection agency without first having applied for and obtained a license).

I.  Whether a Debt Purchaser Is a "Collection Agency" Subject to Licensing Requirements under the WCAA

The first issue is whether debt buyers are "collection agencies" subject to

licensure under the WCAA. The relevant statutory provision defines a "collection

agency" as

> [a]ny person directly or indirectly engaged in soliciting claims for collection, or collecting or attempting to collect claims owed or due or asserted to be owed or due another person.

RCW 19.16.100(2)(a).[6] We hold this definition is ambiguous, but the most reasonable

interpretation is that debt buyers fall within it when they solicit claims for collection.[7]

Recent amendments additionally clarify that this interpretation is correct.

A. *The statute is ambiguous*

The purpose of statutory interpretation is "to determine and give effect to the

intent of the legislature." *State v. Sweany,* 174 Wn.2d 909, 914, 281 P.3d 305 (2012);

---

[6] The statute also lists entities that are not collection agencies. RCW 19.16.100(3). However, no provision specifically addresses debt buyers. Ch. 19.16 RCW.

[7] "Solicit" clearly requires some affirmative conduct, but the statute's ambiguity arises because parties disputed whether the statute applied to debt buyers who were soliciting/collecting claims they owned, as opposed to third party claims. Indeed, the Collection Agency Board (Board)—the agency charged with administering the WCAA—struggled to determine whether debt buyers fall under the statutory definition due to this ambiguity. *See* RCW 19.16.410. In a July 2004 meeting, the Board adopted an interpretation that debt buyers that collect solely on their own claims *and* in their own names are not covered by chapter 19.16 RCW. But in a more recent October 2011 board meeting, the Board acknowledged its 2004 decision and asked an assistant attorney general to reexamine whether debt buyers fall under the definition of a "collection agency" in RCW 19.16.100(2). The assistant attorney general offered no answer but suggested that debt buyers should fall under the department's regulatory oversight responsibilities. Finally, during a September 2012 meeting, the Board unanimously passed a resolution that the Board should "continue to review the issues" and "that the Board's current and past minutes are not intended for use as persuasive authority on those issues." Thus, the enforcing agency struggled to determine whether debt buyers fell within the scope of the definition, ultimately deciding that further research was necessary. This supports the conclusion that the statutory language is ambiguous.

State v. J.P., 149 Wn.2d 444, 450, 69 P.3d 318 (2003); In re Pers. Restraint of Williams, 121 Wn.2d 655, 663, 853 P.2d 444 (1993). When possible, the court derives legislative intent solely from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole. State v. Ervin, 169 Wn.2d 815, 820, 239 P.3d 354 (2010); Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). We employ traditional rules of grammar to discern plain meaning. State v. Jim, 173 Wn.2d 672, 689, 273 P.3d 434 (2012) (citing State v. Bunker, 169 Wn.2d 571, 578, 238 P.3d 487 (2010)). If the statute remains susceptible to more than one reasonable meaning, it is ambiguous. City of Seattle v. Fuller, 177 Wn.2d 263, 269-70, 300 P.3d 340 (2013).

Here, the use of a comma and the disjunctive "or" to separate "soliciting claims for collection" and "collecting or attempting to collect claims owed or due or asserted to be owed or due another person" strongly suggests that there are two types of collection agencies. See HJS Dev., Inc. v. Pierce County ex rel. Dep't of Planning & Land Servs., 148 Wn.2d 451, 473 n.94, 61 P.3d 1141 (2003); accord Riofta v. State, 134 Wn. App. 669, 682, 142 P.3d 193 (2006) ("or" is disjunctive unless there is clear legislative intent to the contrary). In addition, the absence of a comma before the qualifying phrase "owed or due or asserted to be owed or due another person" indicates that the phrase refers only to the second type of collection agency. Bunker, 169 Wn.2d at 578 (under the last antecedent rule, a qualifying phrase refers to the last antecedent, but a comma before the qualifying phrase indicates that the phrase applies to all antecedents).

"Solicit" appears once more in another part of the statute listing prohibited activities applicable to licensees; under RCW 19.16.250, licensees may not attempt to *enforce* a claim by advertising or threatening to advertise sale of that claim and may not *solicit* a claim by agreeing to advertise or threaten to advertise sale of that claim. Thus, in both provisions, the two regulated actions are (1) enforcement/collection of a claim and (2) solicitation of a claim.

Accordingly, a reasonable reading of the statute is that it defines two types of "collection agencies": those that solicit claims for collection and those that collect claims owed to another. Collection agencies that fall within the first category of entities—entities that solicit claims for collection—need not collect claims owed to another. Accordingly, we reject defendants' argument that debt buyers cannot be collection agencies simply because they collect claims they purchase and own, and we hold that debt buyers qualify as collection agencies under the WCAA as long as they solicit claims for collection.

The statute does not define "solicit." *See* RCW 19.16.100. Webster's dictionary defines "solicit" as "to endeavor to obtain by asking or pleading." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2169 (2002). In other words, soliciting claims for collection involves conduct aimed at procuring a claim for collection. A passive market participant does not "solicit" claims for collection. There must be some affirmative act on the part of the solicitor. For example, the solicitor could advertise that it is purchasing claims, target individual sellers, enter into contracts with sellers to purchase claims, or perform market-based research to generate lists used to purchase claims. *See, e.g.*, RCW 19.182.010(7) ("direct

11

solicitation" means "the process in which the consumer reporting agency compiles or edits for a client a list of consumers who meet specific criteria and provides this list to the client or third party on behalf of the client for use in soliciting those consumers for an offer of a product or service"). By contrast, if a company is formed, sits idle, and never actually solicits or acquires any claims for collection, that company has not solicited claims for collection. Nor has a company solicited claims if it engages in no marketing and merely passively accepts offers.

Here, it is possible that Midland Funding solicited claims for collection if it affirmatively acted to acquire the claims it collected on.[8] But there are disputes whether Midland Funding is, in fact, a passive debt buyer as opposed to one that solicits claims for collection. It is not our task to make factual findings, only to explain

---

[8] Midland Funding was formed to purchase claims for collection, has actually purchased claims, and has subsequently filed 7,278 collection lawsuits in Washington between 2005 and 2010. It strains credulity to suggest that Midland Funding acquired 7,278 claims for collection without ever undertaking any steps to solicit claims. In addition, defendant Encore Capital files reports with the United States Securities and Exchange Commission (SEC). Defendants Midland Funding and MCM's financial and operational information are not separately required but, rather, are subsumed in the disclosures made by Encore Capital to the SEC. Indeed, in its 2010 10-Q filing with the SEC, Encore Capital explains:

> Encore Capital Group, Inc. ("Encore"), through its subsidiaries (collectively, the "Company"), is a systems-driven purchaser and manager of charged-off consumer receivable portfolios . . . . The Company purchases receivables based on account-level valuation methods, and employs a suite of proprietary statistical models across the full extent of its operations. . . . Moreover, the Company has one of the industry's largest distressed consumer databases, comprised of approximately 20 million consumer accounts.

ECF 128-1, at 5 (Encore Capital Grp. Inc. Quarterly Report (Form 10-Q), at 3 (Aug. 2, 2010)).

Although the SEC filing does not conclusively establish that Midland Funding solicits claims for collection, it has no employees and acts only through employees of other Encore Capital subsidiaries.

Washington law. Thus, we hold that Midland Funding, a debt buyer, is a "collection agency" under RCW 19.16.100(2) if the district court finds that Midland Funding solicited claims for collection—that is, if Midland Funding or its agents took any affirmative steps to obtain claims for collection.

Regarding the remainder of the definition, there is no dispute that debt buyers like Midland Funding are purchasing "claims" because Midland Funding purchases portfolios of consumer debt, particularly credit card obligations, arising from agreement or contract. *See* former RCW 19.16.100(5) ("claim" is "any obligation for the payment of money or thing of value arising out of any agreement or contract, express or implied"). In addition, Midland Funding solicits claims "for collection" even if it outsources the collection as long as its purpose for soliciting the claim is collection. None of the statutory exemptions applies to persons who outsource collection. *See* former RCW 19.16.100(3)(a)-(f). In sum, debt buyers like Midland Funding fall within the statutory definition of "collection agency" if they solicit claims for collection. This interpretation gives effect to the overall purpose of the WCAA—to prohibit unfair or deceptive debt collection practices.

## B. The 2013 amendments to RCW 19.16.100 clarify that debt buyers are "collection agencies"

Although we generally presume that a new legislative enactment is an amendment that changes a law, the presumption may be rebutted by clear evidence that the legislature intended an interpretive clarification. *State v. Elmore,* 154 Wn. App. 885, 905, 228 P.3d 760 (2010) (citing *Johnson v. Morris,* 87 Wn.2d 922, 926, 557 P.2d 1299 (1976)); *see also Roe v. TeleTech Customer Care Mgmt. (Colo.) LLC,* 171 Wn.2d

736, 751, 257 P.3d 586 (2011). The new amendment provides that a collection agency includes:

> (d) Any person or entity that is engaged in the business of purchasing delinquent or charged off claims for collection purposes, whether it collects the claims itself or hires a third party for collection or an attorney for litigation in order to collect such claims.

LAWS OF 2013, ch. 148, § 1 (codified at RCW 19.16.100(2)(d)). There are two indications that this amendment is a clarification and not a change in the law.

First, as discussed, former RCW 19.16.100(2)(a) was ambiguous with respect to whether debt buyers who collect on claims they purchase and own are "collection agencies." *See Elmore,* 154 Wn. App. at 905 (one indication a new enactment is a clarification is that the original statute was ambiguous). There has been no judicial guidance on the issue; no court has addressed whether debt buyers were included in the statutory definition. Indeed, the reason the legislature amended the statute was to make clear that debt buyers are covered. *See* FINAL B. REP. ON SUBSTITUTE H.B. 1822 at 1, 63d Leg., Reg. Sess., at 1 (Wash. 2013); H.B. REP. ON SUBSTITUTE H.B. 1822, at 2-3 (writing that debt buyers were not "specifically" or "technically" covered by the WCAA, suggesting they were implicitly covered). The amended definition does not conflict with the former statute. The legislature has merely clarified a definition that, in application, connoted an ambiguous meaning.

Second, the legislature amended RCW 19.16.100 following uncertainty as to whether the original enactment encompassed debt buyers. When an amendment is adopted soon after a disagreement regarding the meaning of the law, courts have concluded that the amendment is clarifying. *See, e.g., Barstad v. Stewart Title Guar.*

*Co.,* 145 Wn.2d 528, 536-37, 39 P.3d 984 (2002) (legislature amended definition after we declined to interpret definition in four consecutive decisions, holding that amended statute resolved ambiguity); *McGee Guest Home, Inc. v. Dep't of Soc. & Health Servs.,* 142 Wn.2d 316, 324, 12 P.3d 144 (2000) (amendments clarified legislature's view of statute that a recent superior court decision had called into question). Here, for eight years the Board struggled to determine whether debt buyers fell within former RCW 19.16.100(2)(a), ultimately deciding at a meeting in September 2012 that the issue required yet further examination. Just a few months later, H.B. 1822 was introduced in the House of Representatives. H.B. 1822, 63d Leg., Reg. Sess. (Wash. 2013) (first reading on Feb. 11, 2013). Thus, the amendment's aim was to clarify uncertainties that arose from the enforcement of the WCAA.

To conclude, we hold that the preamended definition of "collection agency" includes debt buyers who solicit claims for collection. Midland Funding meets this requirement if it sought to purchase delinquent debts for collection. The recent amendment clarifies that debt buyers are collection agencies.

II.  Whether Midland Funding May File Collection Lawsuits in Washington without a License

The second certified question is whether a company, such as Midland Funding, can file lawsuits in the state of Washington on delinquent consumer accounts without being licensed as a collection agency. We hold that it cannot if it is found to be a "collection agency" under former RCW 19.16.100(2) because RCW 19.16.110

unambiguously requires persons acting as a collection agency to first obtain a
license.[9]

RCW 19.16.110 provides:

No person shall act, assume to act, or advertise as a collection agency
or out-of-state collection agency as defined in this chapter, except as
authorized by this chapter, without first having applied for and obtained
a license from the director.

All persons who act as a collection agency under the WCAA must obtain a license
under RCW 19.16.110.[10] Here, if the district court finds that Midland Funding is a
"collection agency," then Midland Funding is in violation of RCW 19.16.110. RCW
19.16.110 unambiguously requires any person acting as a collection agency to obtain
a license. Midland Funding acts as a collection agency if it solicits claims for
collection. *See* former RCW 19.16.100(2)(a). This section applies whether or not a
collection agency files collection lawsuits.[11]

---

[9] RCW 19.16.260, regarding licensing prerequisites to collection lawsuits, was amended in
2013 to require collections agencies that file lawsuits to collect their *own* claims to allege and
prove that they are licensed. *See* LAWS OF 2013, ch. 148, § 3 (adding "its own claim or" to the
provision). Because we can and do decide the case pursuant to RCW 19.16.110, we need
not analyze the effect of this amendment. We also note that courts have analyzed claims
under RCW 19.16.110 separately from claims under RCW 19.16.260. *See Moritz v. Daniel
N. Gordon, PC*, 895 F. Supp. 2d 1097, 1112-113 (W.D. Wash. 2012) (finding plaintiff's RCW
19.16.110 claim valid but the RCW 19.16.260 invalid because no evidence defendant violated
RCW 19.16.260 simply by violating RCW 19.16.110); *see Paris v. Steinberg & Steinberg*, 828
F. Supp. 2d 1212 (W.D. Wash. 2011) (analyzing RCW 19.16.110 claim first and then turning
to RCW 19.16.260 claim).

[10] We note that an entity that originates loans and then merely collects on its own claims
would not qualify as a "collection agency" under RCW 19.16.100 and thus would not need to
be licensed.

[11] Midland Funding may also need a license under the WCAA if it is found to be an alter ego
of its parent, MCM.

## CONCLUSION

To conclude, we answer the first certified question: Yes, the definition of a "collection agency" in RCW 19.16.100 includes debt buyers if the debt buyer solicits claims for collection. We answer the second certified question: No, Midland Funding may not file lawsuits in Washington on delinquent consumer accounts without a license if the district court finds that Midland Funding is a collection agency.

_Wiggins, J._

WE CONCUR.

_Madsen, C.J._

_Johnson, J._

_Owens, J._

_Fairhurst, J._

_Madsen (P.T._

_Stephens, J._

_González, J._

_Gordon McCloud, J._

# Exhibit "B"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KELLI GRAY and all others<br>similarly situated, )<br> )<br> )<br>Plaintiffs, )<br> )<br>vs. )<br> )<br>SUTTELL & ASSOCIATES, P.S., )<br>et al., )<br> )<br>Defendants. )<br>_____ )<br>EVA LAUBER, et al., )<br> )<br>Plaintiffs, )<br> )<br>vs. )<br> )<br>ENCORE CAPITOL GROUP, INC., )<br>et al., )<br> )<br>Defendants. ) | No. CV-09-251-EFS<br>(consolidated with<br>CV-10-5132-EFS) |

DEPOSITION UPON ORAL EXAMINATION OF

DANE ALAN SCOTT

June 10, 2011
9:00 a.m.
1030 North Center Parkway
Kennewick, Washington

TAKEN AT THE INSTANCE OF THE DEFENDANTS

REPORTED BY:
JERI L. CHANDLER, CCR No. 3191

```
 1   APPEARANCES:
 2      For the Plaintiffs:
 3          KIRK D. MILLER
             Kirk D. Miller, P.S.
 4          211 East Sprague Avenue
             Spokane, Washington 99202
 5          PH: (509) 413-1494
             FAX: (509) 413-1724
 6          kmiller@millerlawspokane.com
 7      For the Defendants Suttell & Hammer, P.S., Mark T.
         Case and Jane Doe Case, Malisa L. Gurule and John Doe
 8       Gurule, Karen Hammer and Isaac Hammer, Bill Suttell
         and Jane Doe Suttell:
 9
             BRAD FISHER
10           Davis Wright Tremaine LLP
             1201 Third Avenue
11           Suite 2200
             Seattle, Washington 98101-3045
12           PH: (206) 757-8042
             FAX: (206) 757-7042
13           bradfisher@dwt.com
14                  -and-
15           CARL E. HUEBER
             Winston & Cashatt
16           601 West Riverside
             Suite 1900
17           Spokane, Washington 99201
             PH: (509) 838-6131
18           FAX: (509) 838-1416
             ceh@winstoncashatt.com
19
20      For the Defendants Encore Capitol Group, Inc., Midland
         Credit Management, Inc., Midland Funding, LLC:
21
             ASHELEY G. DEAN
22           Hogan Lovells
             1999 Avenue of the Stars
23           Suite 1400
             Los Angeles, California 90067
24           PH: (310) 785-4600
             FAX: (310) 785-4601
25           asheley.dean@hoganlovells.com
```

Page 3

1                           I N D E X

2    Gray vs. Suttell
     No. CV-09-251-EFS
3    June 10, 2011

4

5                      T E S T I M O N Y

6    DANE ALAN SCOTT

7                                            PAGE NO.

8    Examination by Mr. Fisher                 4-45

9    Examination by Ms. Dean                  45-53

10

11                      E X H I B I T S

12   No.      Description                        Page

13   1     Credit Card statements from WaMu        4

14   2     Collection of documents produced by    22
           plaintiff
15

     3     Credit report dated 2/14/11 from       31
16         Costco

17   4     Pre-Legal Notification from Midland    35
           Credit Management, Inc.
18

     5     Letter dated 6/7/09 to Dane Scott from 36
19         MCM

20   6     Letter dated 8/18/09 to Dane Scott from 36
           Suttell & Associates
21

22

23

24

25

b92c14b9-592b-4595-8815-d581127957bf

1    BE IT REMEMBERED that on Thursday, June 9, 2011, at

2  9:00 a.m., at 1030 North Center Parkway, Kennewick,

3  Washington, the deposition of DANE ALAN SCOTT was taken

4  before Jeri L. Chandler, Registered Professional Reporter

5  and Certified Court Reporter.  The following proceedings

6  took place:

7

8  DANE ALAN SCOTT,              being first duly sworn to
                                 tell the truth, the whole
9                                truth, and nothing but the
                                 truth testified as follows:
10

11         (Exhibit 1 was marked for

12         identification.)

13

14                      EXAMINATION

15  BY MR. FISHER:

16     Q    Good morning, Mr. Scott.  Would you please state

17  your full legal name.

18     A    Dane Alan Scott.

19     Q    And, Mr. Scott, what is your current residence

20  address?

21     A    811 West 27th Avenue, Kennewick, Washington,

22  99337.

23     Q    And how long have you lived at the West 27th

24  Avenue residence?

25     A    Approximately five years.

1    Q    Mr. Scott, do you understand that you're

2  testifying under oath today?

3    A    I do.

4    Q    And that your testimony is just like testimony in

5  a court to a judge or a jury?

6    A    Yes.

7    Q    My name is Brad Fisher.  I'm a lawyer with Davis

8  Wright Tremaine, and we represent the Suttell & Hammer law

9  firm and certain individual attorneys affiliated with that

10  firm.

11         Do you understand that you're suing the Suttell

12  law firm?

13    A    Yes, I do.

14    Q    Why are you suing the Suttell law firm?

15    A    To -- on the basis of the -- the legal issues for

16  the attorney fees and the State of Washington licensing

17  issue.

18    Q    And it's your belief that the Suttell firm should

19  be licensed somehow; is that correct?

20    A    No.

21    Q    So with respect to the Suttell firm, your

22  understanding of the reason you're suing them is because

23  of a request for attorneys' fees that they made?

24    A    No.

25    Q    Okay.  Sorry.  I misunderstood your prior answer.

1   So why is it that you're suing the Suttell firm?

2       A    I didn't know we were suing the Suttell firm.

3       Q    You didn't understand you were suing the law

4   firm?

5       A    I'm only familiar with Midland.

6       Q    Okay.  So you have an understanding as to why

7   you're suing Midland but not why you're suing the Suttell

8   law firm or the lawyers at that firm.  Is that a fair

9   statement?

10      A    I'm kind of confused on what Suttell is.

11      Q    Have you ever heard of Suttell & Associates or

12  Suttell & Hammer?  Are either of those names familiar to

13  you?

14      A    Yeah.  The attorneys, yes.

15      Q    That's who they are.  It is a law firm, and I

16  represent the law firm and the attorneys in that law firm.

17          Just so I can close the loop here and move on to

18  my other questions, do you have an understanding -- do you

19  know whether you're suing the Suttell law firm?

20      A    Not the law firm.  I was understanding Midland.

21      Q    You had a credit card account with Washington

22  Mutual?

23      A    Yes.

24      Q    And how long did you have that credit card

25  account?

1     A     I'm unsure of dates.

2     Q     Have you had more than one credit card account

3  with Washington Mutual?

4     A     Yes.

5     Q     How many credit card accounts -- how many

6  Washington Mutual credit card accounts have you had?

7     A     Two.

8     Q     Did you default on your payment obligations on

9  the Washington Mutual -- on one of your Washington Mutual

10  credit card accounts?

11          MR. MILLER:  Objection to the extent it calls for

12  a legal conclusion.

13          Go ahead and answer.

14          THE WITNESS:  I don't really understand

15  "default."

16  BY MR. FISHER:

17     Q     Well, you understand, when you have a credit card

18  account, you understand you're obligated to make payments?

19     A     Yes.

20     Q     Did you miss payments that were due on your

21  Washington Mutual credit card account?

22     A     Yes.

23     Q     Did you stop making payments altogether at a

24  certain point on your Washington Mutual credit card

25  account?

b92c14b9-592b-4595-8815-d581127957bf

1   A   Yes.

2   Q   You understand that there is a balance, an

3  outstanding balance, on the Washington Mutual credit card

4  account; correct?

5   A   Correct.

6   Q   There's an amount of money that's still owed on

7  that account that you have not paid; correct?

8   A   Correct.

9   Q   You're not disputing that the charges that have

10  appeared on your Washington Mutual account statements are

11  not valid charges; correct?

12   A   Say that again.

13   Q   I'm trying to understand whether you take issue

14  with any of the charges that have appeared on your

15  Washington Mutual statements.  Do you dispute that you

16  made any of the charges that appear on your statements?

17   A   On the statement, no.

18   Q   The reporter has handed to you a set of documents

19  that have been marked as Exhibit 1 to your deposition.  Do

20  you have Exhibit 1 in front of you?

21   A   Yes.

22   Q   I'd like to just walk through these.  And because

23  they're not sequentially numbered, we'll have to be a

24  little descriptive with respect to what we're looking at.

25       Page 1 of Exhibit 1, this is a statement on one

1    of your Washington Mutual credit card accounts; correct?

2        A    Correct.

3        Q    And your mailing address is reflected on this

4    statement; correct?

5        A    Correct.

6        Q    And the date of this -- or the payment due date

7    on this statement is August 21st, 2007; is that correct?

8        A    I'm not seeing the due date.

9             MR. MILLER:  Point that out for him.

10            THE WITNESS:  Okay.  8/12, yes.

11   BY MR. FISHER:

12       Q    8/21/07?

13       A    Yes.

14       Q    And this is -- these questions are for

15   identifying this document.  And this is -- do you see the

16   account number in the top right --

17       A    Yes.

18       Q    -- of that statement?

19            Do you understand that to be the account number

20   for one of your Washington Mutual credit card accounts?

21       A    The last four digits, I recognize.

22       Q    The 3330?

23       A    Uh-huh.

24       Q    That's a yes?

25       A    Yes.

1    Q    You recognize those four numbers?

2    A    Yeah.

3    Q    Do you have any reason to believe that page 1 of

4  Exhibit 1 is not a true and correct copy of a periodic

5  account statement on the account ending in 3330?

6    A    Right.

7    Q    You agree that this is an authentic statement?

8    A    It appears to be, yeah.

9    Q    Let's turn to page 2 of Exhibit 1, another

10  statement, payment due date 9/19/07.  Do you have that in

11  front of you?

12    A    I do.

13    Q    This shows a payment on or about August 10 of

14  $4,217.  Do you see that?

15    A    I do.

16    Q    Do you recall paying down or paying off the

17  balance on this account in the fall of 2007?

18    A    Yes, I do.

19    Q    And do you believe this is an authentic copy of

20  one of your account statements?

21    A    Yes.

22    Q    Flipping back to the next stapled document, an

23  account statement with a payment due date of October 18,

24  2007, do you have that in front of you?

25    A    I do.

1    Q    Does this appear to be a statement for the

2  account ending in 3330?

3    A    Yes.

4    Q    Flip to the next statement, payment due date

5  11/19/07, showing one charge at the Burger Ranch in

6  Kennewick.  Does this appear to be an authentic statement

7  on your Washington Mutual account?

8    A    Yeah, it appears to be.

9    Q    Let's keep going.  Next statement, payment due

10  date December 18, 2007.  Does this appear to be -- to you

11  to be an authentic statement on your Washington Mutual

12  account?

13    A    Yes.

14    Q    And there is three charges here to an entity, Six

15  States Distribution.  Do you see that?

16    A    I do.

17    Q    What are those charges for?

18    A    Truck repair.

19    Q    And that's a repair of what truck?

20    A    A 2004 Dodge.

21    Q    Is this a personal vehicle?

22    A    Uh-huh.

23    Q    That's a yes?

24    A    Yes.

25    Q    Do you use -- what do you do for work?

1    A    I'm a maintenance manager for 300 apartments.

2    Q    That sounds like a horrible job.

3    A    It's rough.

4    Q    Do you use your truck in connection with your job

5    duties?

6    A    Uh-huh.

7    Q    That's a yes?

8    A    Yes.

9    Q    Sorry.  Just for the record --

10   A    Sorry.

11   Q    So we have a clear record, it's good to answer

12   "yes" or "no."

13        Do you expense truck repairs such as those

14   reflected on the 12/18/07 Washington Mutual statement --

15   do you expense those as business expenses as part of your

16   job?

17   A    No.

18   Q    So you don't think you deduct maintenance and

19   repairs and money that you spend on your truck -- those

20   are not deducted on your tax returns as business expenses?

21   A    No.

22   Q    Let's turn to the next statement, payment due

23   date of 1/17/08.  Does this appear to be an authentic copy

24   of your Washington Mutual account statement?

25   A    Yes.

1    Q    Let's turn to the next statement, payment due

2    date February 19, 2008.  Does this appear to be an

3    authentic copy of an account statement for the account

4    ending in 3330?

5    A    It appears to be, yes.

6    Q    And I know this was several years ago.  Generally

7    speaking, do these appear to be the kind of charges that

8    you would make on your Washington Mutual account?

9    A    Yes.

10   Q    And the balance on the account is now back up to

11   in excess of $3500; is that correct?

12   A    Yeah, according to this.

13   Q    And you understood that you would have to repay

14   that money to Washington Mutual at some point; correct?

15   A    Yes.

16   Q    Let's turn to the next statement, payment due

17   date March 20, 2008.  Does this appear to be an authentic

18   copy of a statement for the account ending in 3330?

19   A    Yes.

20   Q    And you would receive account statements monthly

21   from Washington Mutual on this account; correct?

22   A    Yes.

23   Q    Let's turn to the following statement, payment

24   due date April 22, 2008, same questions.  Do you identify

25   this as an authentic copy of an account statement?

1     A   Yes.

2     Q   And you don't dispute the charges or the activity

3 that's reflected in the transaction section of this

4 account statement?

5     A   They appear to be correct, but, like I said, it's

6 2008. So --

7     Q   Okay. Next statement in this stack, payment due

8 date May 21, 2008. Does this appear to be a copy of a

9 monthly statement for account 3330?

10    A   Yes.

11    Q   And I note here and on the prior statement that

12 it looks like you've hit an overlimit -- you were over

13 your credit limit on the account; is that correct?

14    A   It appears so, yeah.

15    Q   Do you recall maxing out this account in the

16 spring of 2008?

17    A   No.

18    Q   Next, let's move on to the next statement,

19 payment due date June 19, 2008. Does this appear to be an

20 authentic copy of the account statement for the account

21 ending in 3330?

22    A   It appears to be, yes.

23    Q   And you were -- you were receiving these on a

24 monthly basis; correct?

25    A   Yes.

1    Q    And as reflected here, for example, on the

2  June 19, 2008 statement, you were making payments on the

3  account; is that correct?

4    A    Yes.

5    Q    Next statement, July 22 -- payment due date,

6  July 22, 2008.  Any reason to believe this is not an

7  authentic statement for the account ending in 3330?

8    A    No.  It appears correct.

9    Q    Let's move on to the next statement, payment due

10  date August 20, 2008.  Does this appear to be an authentic

11  statement on your Washington Mutual account?

12    A    It appears to be, yes.

13    Q    And you did not make a payment on that account

14  during this period; is that correct?

15    A    I'm not sure, being so long ago.

16    Q    Let's look at the next account statement, payment

17  due date September 22, 2008.  Does this appear to be an

18  authentic copy of a periodic statement on the account

19  ending in 3330?

20    A    Appears to be, yes.

21    Q    Next account statement, payment due date

22  10/21/2008.  Do you have that statement in front of you?

23    A    I do.

24    Q    Does this appear to be an authentic copy of an

25  account statement on your Washington Mutual account ending

1    in 3330?

2        A    It appears so, yes.

3        Q    Do you have any recollection of receiving notice

4    in the fall of 2008 that your account was past due and was

5    over the credit limit?

6        A    No.

7        Q    You see the balance due as of September 24, 2008,

8    on this statement --

9        A    I do.

10       Q    -- $4,809.29?  Do you see that figure?

11       A    I do.

12       Q    Any reason to dispute that that was the amount

13   that was due and owing on the account ending in 3330 as of

14   the date of this statement?

15       A    This is what my bill tells me.  So --

16       Q    And I'm just asking, you didn't have any reason

17   to believe that that amount was inconsistent with the

18   charges you had made or your credit agreement?

19       A    No.

20       Q    Next statement, payment due date November 20,

21   2008.  Does this appear to be an authentic copy of your

22   monthly account statement?

23       A    It appears to be, yes.

24       Q    Next statement -- we only have two left here.

25   The next statement, the payment due date December 18,

1   2008.  Does this appear to be an authentic copy of an

2   account statement?

3       A    Appears to be, yes.

4       Q    So, as you sit here today, you don't have any

5   recollection of receiving monthly statements from

6   Washington Mutual telling you that your account was past

7   due and over the credit limit?

8       A    Due to the length of time now, no.

9       Q    But you have no reason to believe that you

10  weren't receiving these account statements on a monthly

11  basis at your West 27th Avenue --

12      A    No.

13      Q    No reason to think you didn't receive it?

14      A    No.

15      Q    Final statement in Exhibit 1, payment due date

16  January 20, 2009.  Do you have that statement in front of

17  you?

18      A    I do.

19      Q    Any reason to believe this is not a true and

20  correct copy of the monthly account statement for the

21  account ending in 3330?

22      A    No.

23      Q    And do you see the balance that's stated as due

24  as of December 24, 2008?

25      A    I do.

1    Q    And what is the balance that was due as of that

2    date?

3    A    5,208.19.

4    Q    Do you have any reason to believe that that is

5    not the true and correct amount that was owed on the

6    Washington Mutual account ending in 3330 as of

7    December 24, 2008?

8    A    No.

9    Q    Do you remember, at some point in time, making a

10   conscious decision that you weren't going to make any more

11   payments on the Washington Mutual account?

12   A    One more time.

13   Q    Yeah.  Do you remember, at any point in time,

14   making a conscious decision that you were not going to

15   make any more payments on the Washington Mutual account

16   ending in 3330?

17   A    Yes.

18   Q    When did you make the decision that you weren't

19   going to make further payments?

20   A    When my interest rates went up to an unaffordable

21   amount.

22   Q    What's your best recollection of when that

23   happened?

24   A    I really don't know.

25   Q    What was the -- what was the change in the

1   interest rate that caused you to stop making payments?

2       A    It just went up a considerable amount, doubling

3   my minimum payment.

4       Q    So we're clear here, you're not suggesting that

5   the increase in the rate was somehow improper or illegal,

6   are you?

7       A    I don't know.

8       Q    But that's not -- you didn't -- you didn't

9   believe that what had happened was illegal; it just meant

10  the payment was too large for you to make.  Is that a fair

11  statement?

12      A    Correct.

13      Q    Did you look for documents that you might have

14  concerning the Washington Mutual account?

15      A    Yes.

16      Q    You made a search for those documents?

17      A    Uh-huh.

18      Q    That's a yes?

19      A    Yes.

20      Q    Did you find any documents related to that

21  account?

22      A    No.

23      Q    And I try to be somewhat specific.  If it's okay

24  with you, when I refer to the "Washington Mutual account,"

25  for purposes of my questions today, I'm referring to the

1  account ending in 3330.  Is that acceptable to you?

2      A     Yeah.

3      Q     And if any of your answers require you to speak

4  to the other Washington Mutual account as well, just let

5  me know that.  I'm interested in the account ending in

6  3330.  That's where my questions are going today.

7      A     Okay.

8      Q     Just so there's no ambiguity in the record here.

9            So you did look for documents related to the

10 Washington Mutual account, but you didn't find any; is

11 that correct?

12     A     Correct.

13     Q     So you don't keep copies of the account

14 statements?

15     A     Huh-uh, no.

16     Q     And you don't have copies of cancelled checks

17 reflecting payments on the account?

18     A     No.

19     Q     Do you have any reason to believe that the

20 Washington Mutual account was not transferred to Midland

21 Funding?

22     A     I don't know if it was or wasn't.

23     Q     So you don't know one way or the other, but no

24 reason to believe that it was not?

25     A     That's correct.

1    Q    So you don't dispute that you owe the $5,208 that

2    was reflected in the final statement in Exhibit 1?  You

3    don't dispute that you owe at least that amount of money

4    to someone; correct?

5    A    That's what my statements are telling me, yes.

6    Q    And you have no reason to dispute that the

7    statements are accurate with respect to the calculation of

8    the amount owed; correct?

9    A    Correct.

10   Q    So if you were sued to collect on the $5,208 that

11   was owed on the Washington Mutual account -- let's say

12   Washington Mutual had filed that lawsuit -- you would not

13   dispute that that was a valid debt that you owed to

14   Washington Mutual; correct?

15        MR. MILLER:  Objection.  Calls for a legal

16   conclusion.

17        Go ahead and answer.

18        THE WITNESS:  Probably not, no.

19   BY MR. FISHER:

20   Q    Have you ever been a party in any other lawsuit?

21   A    No.

22   Q    So you've never sued anyone for anything?

23   A    No.

24   Q    And you've never been sued yourself?

25   A    Just the Midland.

1    Q    The Benton County -- the state court case that

2    Midland filed against you?

3    A    Uh-huh.

4    Q    That's a yes?

5    A    Yes.

6    Q    Have you ever had your deposition taken before?

7    A    No.

8         (Exhibit 2 was marked for

9         identification.)

10   BY MR. FISHER:

11   Q    Mr. Scott, the reporter has handed you a set of

12   documents that have been marked as Exhibit 2 to your

13   deposition.  And I will represent to you that these are

14   documents that were provided to us by your lawyers in

15   connection with this case.

16        And you'll note that, in the lower left-hand

17   corner, the documents have some numbering on them that

18   says 3405 Gray, and the last page of Exhibit 2 is 3430

19   Gray.

20        Do you recognize the documents contained in

21   Exhibit 2?

22   A    Yes, I think so.

23   Q    Do you maintain files -- well, do you maintain

24   any files related to the Benton County lawsuit filed by

25   Midland Funding against you?

1    A    I have copies of them.

2    Q    You don't keep -- you don't keep files on a

3    two-hole-punch system; correct?

4    A    No.

5    Q    Do you recall receiving a summons and complaint

6    in the Midland Funding suit?

7    A    Yes.

8    Q    And if you turn to the page that's marked with

9    the Bates number 3409 Gray, it's an affidavit of service.

10   Have you seen this document before?

11   A    I don't think I've seen this one.

12   Q    This is what's known as an affidavit of service

13   attesting to the fact that a summons and complaint were

14   served on you at the 27th Avenue address on October 7,

15   2009.

16        Do you recall receiving a summons and complaint

17   on or about October 7, 2009?

18   A    I believe so, yes.

19   Q    Who is Jessica?

20   A    She's my fiancee.

21   Q    Does she live with you?

22   A    Yes.

23   Q    Any reason to believe she did not, in fact,

24   receive a copy of process on October 7, 2009?

25   A    No.  I think she did.

b92c14b9-592b-4595-8815-d581127957bf

1    Q    What did you do after the summons and complaint

2    were served on you on or about October 7, 2009?

3    A    Nothing.

4    Q    Did you read the papers?

5    A    I did.

6    Q    Did you understand that if you didn't respond to

7    the summons and complaint, that a default judgment might

8    be entered against you?

9    A    Not really.  I'm not real good with all these

10   papers.  First time I had seen them.

11   Q    Can you turn to page 1 of Exhibit 2, 3405 Gray,

12   just the first page.  This is a copy of a summons.  Do you

13   recall reading the second paragraph of this summons

14   describing what would happen if you didn't respond to the

15   complaint?

16   A    Yes.

17   Q    And this tells you that a default judgment could

18   be entered against you if you failed to take action within

19   20 days; is that correct?

20   A    Correct.

21   Q    And that a default judgment is one where the

22   plaintiff is entitled to what he asked for because you

23   have not responded.

24        Do you recall seeing that when you received these

25   papers?

1    A    Yes.

2    Q    So you didn't do anything in response to the

3  summons and complaint.  What was your understanding of

4  what was going to happen with respect to the lawsuit?

5    A    That they would get a judgment.

6    Q    And let's turn to page 3 of Exhibit 2.  This is

7  the document Bates number 3407 Gray, the first page of the

8  complaint.

9         Do you have that in front of you?

10   A    I do.

11   Q    Paragraph 3 at the bottom of the page, this tells

12  you that this was a lawsuit on the account ending in 3330,

13  which has been assigned to the plaintiff.  Do you see

14  that?

15   A    I do.

16   Q    Did you read that when you received this lawsuit?

17   A    I did.

18   Q    And you understood that the reference here to

19  this account was a reference to the Washington Mutual

20  credit card account; correct?

21   A    Correct.

22   Q    Next page, 3408, paragraph 4 of the complaint,

23  this contains a statement of what the unpaid balance was

24  on the account ending in 3330.  Do you see that?

25   A    I do.

1    Q    And it states that the balance is $5,208.19.  Do

2    you see that?

3    A    I do.

4    Q    And we've already established that you have no

5    reason to believe that that was not a correct statement of

6    an amount owing on the account; correct?

7    A    Correct.

8    Q    And the following paragraph, do you see that

9    under Roman numeral V?

10   A    I do.

11   Q    There's a statement, "Plaintiff may be entitled

12   to attorneys' fees."  Do you see that section?

13   A    I do.

14   Q    And that plaintiffs would request an award of

15   fees to be determined by the court?

16   A    I do.

17   Q    So when you were served with these papers on

18   October 7, 2009, you understand the account -- you

19   understood what the account was that was the subject of

20   the suit; correct?

21   A    Correct.

22   Q    The amount that was being requested as the unpaid

23   balance on the account; correct?

24   A    Correct.

25   Q    And that Midland Funding was going to request

1  attorneys' fees, in an amount to be determined by the

2  court; correct?

3      A    Correct.

4      Q    And that if you didn't take action in response to

5  this, that a court might well grant those requests;

6  correct?

7      A    Correct.

8      Q    Do you recall being served with any other papers

9  after you received process on October 7, 2009, prior to

10 the entry of judgment in the case?

11     A    I don't recall any, no.

12     Q    And I'm not aware of any either.

13          Just if you can turn to the page Bates numbered

14 3410 Gray, it says, "Motion and Declaration For Default

15 Judgment."  You don't have any recollection of receiving a

16 copy of this document; correct?

17     A    No.

18     Q    And if you'd turn back to the page marked 3413

19 Gray, "Affidavit of Judy Richter."  Do you have that in

20 front of you?  Looks like you're on a different page.  I

21 was on 3413, the affidavit of Judy Richter.  Do you see

22 that?

23     A    I do.

24     Q    Do you recall receiving this document?

25     A    No.

1    Q    If there was a representation in this affidavit

2  that you owed $5,208.19 on a Washington Mutual account

3  ending in 3330, you would not have disputed that; correct?

4    A    Say it again.

5    Q    If this affidavit states that you owed $5,208.19

6  on a Washington Mutual account ending in 3330, you would

7  not have disputed that assertion; correct?

8    A    Probably not.

9    Q    So if you had been called into court in this

10  lawsuit and asked to raise your right hand, and you were

11  testifying under oath on the stand and you were asked,

12  Mr. Scott, did you have an account ending in 3330 with a

13  balance of $5,208.19, you would have confirmed that to the

14  court; correct?

15    A    Most likely, given the paperwork I've seen.

16    Q    Let's turn to the portion of Exhibit 2 bearing

17  the Bates number 3426 Gray.  Do you have page 3426 in

18  front of you?

19    A    I do.

20    Q    This is the Order of Default Judgment.  Do you

21  see that?

22    A    I do.

23    Q    Did you receive a copy of this default judgment?

24    A    I can't say if I did for sure or not.

25    Q    When do you recall first learning that a judgment

1  had been entered against you by the Benton County Superior

2  Court in favor of Midland Funding?

3      A    When?

4      Q    Yes.

5      A    Approximately two years ago.

6      Q    How did you find out that a judgment had been

7  entered against you?

8      A    When I got the court documents.

9      Q    And which court documents are those?

10     A    I just don't remember seeing this exact one.

11     Q    Sure.  I understand.  I'm just trying to

12  understand how it came to your attention that there was a

13  judgment against you, what your best recollection of that

14  was.

15     A    I believe a letter in the mail.

16     Q    Do you recall who sent the letter?

17     A    No.

18     Q    And, eventually, you had some funds garnished --

19     A    Correct.

20     Q    -- in connection with this judgment; is that

21  correct?

22     A    That's correct.

23     Q    What's the total amount that has been garnished?

24     A    To the best of my recollection, about -- I think

25  $2400, but I'm not positive.

1      Q    Your best -- your best estimate of the total

2  amount of the funds that have been garnished is around

3  $2400?

4      A    And that's a wild guess because I haven't checked

5  with my company.

6      Q    And the garnishments have been garnishments of

7  your wages from your employer; is that correct?

8      A    Correct.

9      Q    Those are the only funds that have been

10  garnished, to your knowledge?

11      A    Yes.

12      Q    Whatever the number is, it's significantly less

13  than the $5,208 that you admit you owe on the Washington

14  Mutual account; correct?

15      A    I believe so, yes.

16      Q    So whether there was an award of $650 in

17  attorneys' fees or not, you have not yet even paid the

18  principal amount of $5,208 that was owed on the account;

19  correct?

20      A    I can't say an absolute that I haven't paid more

21  or less without checking with my company first.  It could

22  be 4,000, for all I know, because I haven't paid enough

23  attention.

24      Q    Do you think there's any chance it's more than

25  $5,208?

1     A     I don't know for sure without checking.

2     Q     Who would be the person at the company who would

3     know how much had been garnished?

4     A     My payroll.

5     Q     And who does your payroll?  Who do you work for?

6     A     Riverstone Residential.

7     Q     Is that a property management company?

8     A     Correct.

9           (Exhibit 3 was marked for

10          identification.)

11    BY MR. FISHER:

12    Q     Mr. Scott, the reporter has handed you a document

13    that's been marked as Exhibit 3 to your deposition.  And I

14    will represent to you that this -- this is also a document

15    that was produced to us by your attorneys in the case.  It

16    bears the Bates number 3431 Gray through 3454 Gray.

17          Do you recognize Exhibit 3?

18    A     I do.

19    Q     What is Exhibit 3?

20    A     My credit report.

21    Q     And this is a credit report that you ran on or

22    about Valentine's Day, 2011?

23    A     Correct.

24    Q     Why did you run this credit report?

25    A     My attorney asked me to.

1    Q    Had you run your credit report prior to this

2    point?

3    A    A few times over my lifetime, but --

4    Q    Not in the recent past?

5    A    No.

6    Q    Let's just take a quick walk through some of this

7    credit report.  Page 2 of the credit report, where the

8    account information starts, do you see that?

9    A    I do.

10   Q    There is an account here, American General

11   Finance.  Do you see that account information?

12   A    I do.

13   Q    This shows that you had a chargeoff on this

14   account of $2700?

15   A    Correct.

16   Q    Is this accurate?

17   A    I believe so.

18   Q    Let's turn to the next entry, looks like Capital

19   One.  Do you see that on the top of page 3, Gray 3433?

20   A    I do.

21   Q    This shows a chargeoff of just under $2200 on a

22   Capital One account.  Do you believe that this is an

23   accurate statement?

24   A    Appears to be, yeah.

25   Q    Next entry below that, another Capital One entry,

b92c14b9-592b-4595-8815-d581127957bf

1   shows a chargeoff of $1750.  Do you believe that's an

2   accurate statement of the disposition of that account?

3        A    Yeah.

4        Q    Next entry, another Capital One entry, shows a

5   chargeoff of $1,109.  Do you see that entry?

6        A    I do.

7        Q    Do you believe that's a correct statement of the

8   disposition of that particular account?

9        A    Yes.

10       Q    Following page, Gray 3435, says CCS/First Savings

11  Bank.  Do you have that in front of you?

12       A    I do.

13       Q    This shows a chargeoff of $2,837.  Do you see

14  that?

15       A    I do.

16       Q    Do you believe that's an accurate statement of

17  the disposition of this account?

18       A    Yes.

19       Q    What was this -- what kind of account was this?

20  Is this a credit card account?

21       A    Credit card.

22       Q    Let's turn to the next page.  It shows a Chase

23  account, which Transunion is reporting as a chargeoff of

24  bad debt.  Do you see that?

25       A    I do.

1     Q    Do you believe you had a Chase account that was

2 charged off?

3     A    Yes.

4     Q    Next entry, another Chase chargeoff. Did you

5 dispute that entry on your credit report?

6     A    No.

7     Q    Next page shows a chargeoff on another Chase

8 account. Do you see that?

9     A    I do.

10     Q    Would you agree, Mr. Scott, that you have a

11 somewhat checkered credit history?

12     A    Right now I do, yes.

13     Q    Is it your belief that something that the

14 defendants in this lawsuit have done has somehow harmed

15 your credit?

16     A    Yeah.

17     Q    And what is it that the defendants have done

18 that's harmed your credit?

19     A    Raised my interest rates up to an unpayable

20 amount.

21     Q    And you're saying that was an action that was

22 taken prior to the lawsuits?

23     A    Correct.

24     Q    Other than an increase in the interest --

25 pre-lawsuit interest rate that was being assessed on your

1   Washington Mutual account, to your knowledge, have the
2   defendants done anything else to impair or harm your
3   credit rating?
4       A    Can you rephrase that a little bit?
5       Q    Yeah.  I'm putting aside -- I heard your answer
6   about an increase in the interest rate on the account
7   prior to the lawsuits.  Other than that, to your
8   knowledge, have the defendants done anything that has
9   impaired your credit?
10      A    Not to my knowledge, no.
11           (Exhibit 4 was marked for
12           identification.)
13  BY MR. FISHER:
14      Q    Mr. Scott, the reporter has handed you a two-page
15  document that's been marked as Exhibit 4 to your
16  deposition.  Do you recognize Exhibit 4?
17      A    Not really, no.
18      Q    Do you recall receiving correspondence from
19  Midland Credit Management or another Midland entity?
20      A    Huh-uh.
21      Q    That's a no?
22      A    No.
23      Q    So you don't recall receiving the pre-legal
24  notification that's been marked --
25      A    No, I don't.

1     Q     -- as Exhibit 4?

2           (Exhibit 5 was marked for

3           identification.)

4    BY MR. FISHER:

5     Q     Mr. Scott, the reporter has handed you a

6    three-page document that's been marked as Exhibit 5 to

7    your deposition.  Do you have any recollection of

8    receiving Exhibit 5?

9     A     No, I don't.

10          (Exhibit 6 was marked for

11          identification.)

12   BY MR. FISHER:

13    Q     Mr. Scott, the reporter has handed you a one-page

14   letter that's been marked as Exhibit 6 to your deposition.

15   Do you have Exhibit 6 in front of you?

16    A     I do.

17    Q     Do you recall receiving Exhibit 6?

18    A     I kind of do, but not clearly.

19    Q     Do you recall being told in the summer of 2009

20   that Midland had acquired your Washington Mutual account?

21    A     Vaguely, yes.

22    Q     And do you recall being told that if you didn't

23   take some action with respect to the account, that legal

24   proceedings would follow?

25    A     Not really, no.

1    Q    Generally, during the summer of 2009, what was

2    your understanding of what was going to happen with the

3    unpaid Washington Mutual account?

4    A    It would probably go to collections.

5    Q    Did you at any point contact someone to try to

6    put together a payment plan for the account?

7    A    No.

8    Q    Did you ever indicate to anyone -- and by that, I

9    mean anyone, the Suttell firm, Midland, Washington Mutual,

10   Chase after it acquired Washington Mutual -- did you ever

11   contact anyone and give them any indication that you

12   intended to pay this debt?

13   A    I think -- I believe I tried to call Washington

14   Mutual and make out some smaller payments.

15   Q    When did you make that call?

16   A    I'm not sure what the date is.

17   Q    Do you know whether it's before or after the

18   summer of 2009?

19   A    No.

20   Q    Did you -- did you speak with someone?

21   A    At Washington Mutual, but they wouldn't take

22   smaller payments.

23   Q    And so that was the only communication you had?

24   A    Yes.

25   Q    Do you believe you've ever had any

1    communications, oral or written, with anyone affiliated

2    with the Suttell law firm?

3        A    Not to my knowledge, no.

4        Q    So the best of your recollection, you've never

5    called the Suttell firm; correct?

6        A    No.

7        Q    And, to the best of your knowledge, they've never

8    called you; correct?

9        A    Correct.

10       Q    How about Midland or any affiliated entities?  Do

11   you recall having any communications with Midland?

12       A    Huh-uh, no.

13       Q    So you didn't call them?

14       A    Not to my knowledge, no.

15       Q    And, to your knowledge, they didn't call you?

16       A    No, I don't believe so.

17       Q    And you don't recall having any written

18   correspondence with Midland Funding?

19       A    No.

20       Q    And you don't recall having any communications

21   with Midland Credit Management?

22       A    No.

23       Q    You're represented by Mr. Miller and some other

24   lawyers in connection with the lawsuit that you have filed

25   against a number of defendants.  How is it that you were

1    introduced to your lawyers in this case?

2        A    I received a letter from Michael Kinkley.

3        Q    And do you have that letter?

4        A    No, I don't.

5        Q    What's your best recollection of what that letter

6    said?

7        A    I really can't say for sure right now, just

8    asking me -- I really don't know, no.

9        Q    Mr. Kinkley was not your lawyer at that time;

10   correct?

11       A    No.

12       Q    And, in fact, you had never met or spoken to him?

13       A    No.

14       Q    But he mailed you a letter essentially soliciting

15   you, asking if you might be interested in having him

16   represent you?

17       A    Correct.

18       Q    And he wanted to represent you in connection with

19   some sort of claim against Midland; correct?

20       A    Correct.

21       Q    Do you have a written engagement agreement with

22   Mr. Kinkley or any of your other lawyers in this case?

23       A    Yes.

24       Q    Is that a document that you signed?

25       A    Yes.

1    Q    It's a document that they signed?

2    A    Correct.

3    Q    Do you have a copy of that agreement?

4    A    I do.

5    Q    What's your recollection of what the substantive

6    provisions of that agreement are?  What does it say?

7    A    That I'd be a class representative and the -- I'm

8    not sure all the papers.  There were four or five.

9    Q    Do you understand that you may be responsible for

10   paying the defendants' attorneys' fees in this case if you

11   lose?

12   A    I do.

13   Q    I want to spend a couple minutes talking about

14   damages that you're claiming in this case.  Can you

15   describe for me how you've been damaged or harmed by the

16   actions of the defendants that you're suing in this

17   litigation?

18   A    Well, my wages have been garnished.

19   Q    Okay.  Anything else?

20   A    My credit report is worse off.

21   Q    Anything else?

22   A    No.

23   Q    Have you paid any money to your attorneys?

24   A    No.

25   Q    You haven't paid any of the costs of this

1  litigation; correct?

2      A    Correct.

3      Q    So let's go to the two items you just mentioned.

4           MR. MILLER:  Brad, whenever you get a chance, I'd

5  like to take a break.

6           MR. FISHER:  Oh, sure.  Let's take a break now.

7           (Recess)

8  BY MR. FISHER:

9      Q    Mr. Scott, we're now back on the record.  Do you

10 understand you're still testifying under oath?

11     A    I do.

12     Q    And when we took our morning break, I believe we

13 were discussing the damages or harm that you believe

14 you've suffered as a result of the actions of the

15 defendants.  And one of the two items you identified was

16 some sort of adverse effect that their actions had had on

17 your credit score, your credit history; is that correct?

18     A    That's correct.

19     Q    Can you elaborate on that at all?  How had the

20 actions of defendants adversely affected your credit

21 score?

22     A    With the interest rates going up and my ability

23 not to pay them equals bad credit.

24     Q    But we've established this morning -- correct --

25 I mean, you don't dispute the amount of the $5,208 debt;

1    correct?

2        A    As far as I know.

3        Q    So if, for example, that debt were being

4    reported, there would be nothing false or inaccurate about

5    that; correct?

6        A    As far as I know.  I've seen 4,000's and I've

7    seen 5,000's.  So I'm a little unsure about that.  So --

8        Q    Have you been -- have you applied for credit

9    that's been denied to you?

10       A    No.

11       Q    Have interest rates changed on any of your other

12   credit accounts in the last three years?  Have you --

13       A    They all did at the same time.

14       Q    When was that?

15       A    At the point when I stopped paying the 3330.

16       Q    And which accounts were those where you saw an

17   increase in your credit card rate when you stopped paying

18   on the Washington Mutual account?

19       A    As you've seen, the Capital One, the Chase, the

20   ones on my credit report that you've seen.  Whether I had

21   late pays or not, they still went up.

22       Q    Let's talk about your -- the amounts that were

23   garnished.  The damage claim there is just that money was

24   garnished; is that correct?

25       A    Say that again.

1    Q    The harm that you're claiming as a result of the

2    garnishments is basically just the fact that money was

3    garnished from your paychecks?

4    A    That's -- I don't really know how to answer that

5    for you.

6    Q    Well, I'm just trying to understand what the

7    dollar amount -- what the claim is.  There was money that

8    was garnished from your paychecks as a result of the

9    default judgment that was entered against you by the

10   Benton County Superior Court; correct?

11   A    Correct.

12   Q    And we don't know today exactly what the dollar

13   amount was --

14   A    Correct.

15   Q    -- that was garnished, but we can obviously

16   figure that out, and there is a number that was garnished.

17        Are you making a claim that you've been damaged

18   beyond that dollar amount that was deducted from your

19   paychecks?

20   A    No.

21   Q    And, again, if the -- if the money was garnished

22   and applied to the $5200 that was owed on the Washington

23   Mutual account, what's improper about that?

24   A    Well, I'm not sure what charge -- what other

25   charges are associated with that.

1    Q    Okay.  But you're saying what other charges that

2    may be above the $5200 that was on your account statement;

3    correct?

4    A    Correct.

5    Q    Okay.  So if you haven't paid more than $5200

6    towards that debt -- we don't have the number, but assume

7    for the purpose of my question that it's less than $5200

8    that's been garnished.  I'm trying to understand why you

9    believe that's improper if you're not disputing that you

10   owe $5200 and the money that's been garnished is being

11   applied against that debt.  What's wrong about that?

12        MR. MILLER:  I'm going to object to the extent it

13   calls for a legal conclusion, but go ahead and answer.

14   BY MR. FISHER:

15   Q    You can answer.

16   A    I have a debt that's owed; and as far as I know,

17   I owe, according to the judge, the $5200.

18   Q    Okay.  And you don't dispute that?

19   A    I am not disputing it.  They were taking it out

20   of my wages.

21   Q    Are you disputing something else about the

22   judgment?

23   A    Yes.

24   Q    And what is it that you're disputing about the

25   judgment?

1      A      The attorney fees --

2      Q      Okay.

3      A      -- that were added to it.  And from what I

4  understand, they shouldn't have been able to do that

5  without being licensed in the state, is my understanding.

6              MR. FISHER:  I don't have any further questions.

7  Thanks.

8

9                          EXAMINATION

10  BY MS. DEAN:

11      Q      My name is Asheley Dean, and I represent the

12  defendants Encore Capitol Group, Midland Funding, and

13  Midland Capital Management.

14              I'm going to go back to some background

15  questions.  Can you describe your level of education for

16  me.

17      A      Graduated high school and two years of college,

18  didn't finish college.

19      Q      What did you study while in college?

20      A      Was going to be a game warden.

21      Q      A game warden, you said?

22      A      Yeah.

23      Q      Did you take any classes in business or finance?

24      A      No.

25      Q      How about economics?

1     A     No.

2     Q     Did you take any classes that dealt with law?

3     A     No.

4     Q     Did you do anything today to prepare for your

5  deposition?

6     A     Not really, not to speak of, no.

7     Q     Did you review any documents?

8     A     My deposition -- or the -- just the dates and

9  where I need to be today.

10     Q     Are you referring to the notice of deposition?

11     A     Yes.

12     Q     Did you speak to your lawyers?  And you don't

13  have to tell me the content of any discussions that took

14  place.

15     A     Yes.

16     Q     Other than your lawyers, did you talk to anybody

17  else about this deposition?

18     A     My work to get the day off.

19     Q     Did you tell them anything about --

20     A     No.

21     Q     -- the subject matter?

22     A     No.

23     Q     Other than your lawyers, have you spoken to

24  anybody about this lawsuit?

25     A     My fiancee.

1    Q    And what did you discuss with your fiancee?

2    A    Just that I'm a class representative in it.

3    Q    Was that all?

4    A    Uh-huh.

5    Q    Did you tell her about the claims you were

6    making?

7    A    No.  She's really not interested.

8    Q    Did you search for any and all documents that

9    might relate to this lawsuit?

10   A    I did.

11   Q    Did you locate any documents?

12   A    The ones I've given to my attorney.

13   Q    So --

14   A    The ones you guys have.

15   Q    So every document that you've located, you've

16   provided to your attorney and, in turn, has been provided

17   to us?

18   A    To the best of my knowledge, yeah.

19   Q    So you said that you had talked to your fiancee

20   about being a class representative in this lawsuit;

21   correct?

22   A    Correct.

23   Q    And have you ever been a class representative in

24   any other litigation?

25   A    No.

1    Q    And what is your understanding of your role as

2    class representative in this lawsuit?

3    A    To take care of the other people that's had

4    garnishments and such things happen to them, also.

5    Q    And is that it?  That's your complete

6    understanding?

7    A    Pretty much.

8    Q    And what are the responsibilities that you

9    believe you have as class representative?

10   A    Depositions like this, any other trials,

11   paperwork to be signed.

12   Q    And it's your understanding that you would

13   participate in all of the things you just --

14   A    Correct.

15   Q    -- described?

16        Do you understand that you're suing my client,

17   Encore Capitol Group; correct?

18        MR. MILLER:  Counsel, I'm going to put in my

19   general objection here to any sort of legal conclusion

20   that would result in a distinction between Encore, Midland

21   Capitol, or Midland Funding -- or Midland Credit, excuse

22   me, Midland Funding.

23        Go ahead and answer the question subject to those

24   objections.

25        And do we have a stipulation that my objection

1    will be ongoing?

2              MS. DEAN:  Yes.

3              MR. MILLER:  Thank you.

4              THE WITNESS:  The only one I'm familiar with is

5    Midland.

6    BY MS. DEAN:

7         Q    But you do understand that claims are being made

8    against Encore Capitol Group; correct?

9         A    Midland, like I said, that's the one I dealt

10   with.  And Encore, I really don't have any knowledge of.

11        Q    Do you have an understanding of the claims that

12   you've made against Midland Funding?  And by Midland

13   Funding, I'm distinguishing between Midland Capitol

14   Management --

15        A    Okay.

16        Q    -- or Credit Management.  I'm sorry.

17        A    I do.

18        Q    And what are the claims that you're making

19   against Midland Funding?

20        A    The attorney fees, whether they're correct, and

21   the licensing issue, if they're truly not licensed to do

22   business in the State of Washington.

23        Q    Is that all?

24        A    Uh-huh.

25        Q    And what claims are you making against Midland

1    Credit Management?

2        A    As far as I know, that's one and the same,

3    Midland.

4        Q    So you're not distinguishing between the two

5    entities?

6        A    No.

7        Q    Going back to your Washington Mutual account

8    ending in 3330, did you -- how did you come to receive

9    that credit card?

10       A    I applied for it.

11       Q    Did you apply online or --

12       A    I believe so, yes.

13       Q    Did you receive any documents in the mail besides

14   what we've seen here today?

15       A    No.

16       Q    Did you sign any documents in connection with

17   your Washington Mutual account?

18       A    I would imagine I would have had to to receive

19   the credit card.

20       Q    Do you have any records of that?

21       A    No, I don't.

22       Q    Did you receive any other paperwork in connection

23   with the credit card application?

24       A    Not to my knowledge, but that's been years ago.

25   I'm not sure.

1    Q    And earlier you testified that you didn't have

2    any cancelled checks reflecting records -- reflecting

3    payments made on the account ending in 3330; is that

4    correct?

5    A    Not at home or in my person, no.

6    Q    Do you have any other records of payment?

7    A    No.  I'm sure all my bank has it.

8    Q    And your bank is?

9    A    HAPO Community Credit Union.

10   Q    Could you spell that?

11   A    H-A-P-O.

12   Q    Have you ever heard of Encore Capitol Group aside

13   from the current litigation?

14   A    No.

15   Q    Do you know who Encore Capitol Group is?

16   A    No idea.

17   Q    Have you received any telephone or e-mail

18   communications from anyone representing themselves to be

19   from Encore Capitol Group?

20   A    Not to my knowledge, no.

21   Q    Any letters?

22   A    No.

23   Q    To your knowledge, did Encore Capitol Group ever

24   do anything to collect upon the $5,000 debt?

25   A    Not that I'm aware of.

1    Q    I'd like to return to Exhibit 4.  This is the

2  pre-legal notification.  You don't recall that; correct?

3    A    No.

4    Q    And Exhibit 5, you don't recall receiving that?

5    A    No.

6    Q    Is there anything that you recall receiving from

7  Midland Credit Management?

8    A    Just the court paperwork when I was served.

9    Q    Did you send any letters or make any telephone

10  calls to Midland Credit Management?

11    A    Not to my knowledge, no.

12    Q    To any of the defendants?

13    A    No.

14    Q    Did you -- upon receiving the summons and

15  complaint, did you take any steps to defend against the

16  lawsuit?

17    A    No, I didn't.

18    Q    Did you incur any costs whatsoever in connection

19  with that lawsuit, other than the garnishment?

20    A    No.

21    Q    Did you ever send any e-mails or anything

22  regarding the lawsuit to anyone other than your lawyers?

23    A    No.

24    Q    Did you ever receive any documents relating to

25  the lawsuit other than the lawsuit itself?

1       A    No.

2       Q    You did testify that you received the summons and

3    complaint; correct?

4       A    Correct.

5       Q    Did you produce that to your attorneys?

6       A    Yes, I believe so.

7       Q    Upon -- did you receive notice that your paycheck

8    was going to be garnished pursuant to the judgment entered

9    against you?

10      A    Yes.

11      Q    Did you call anyone or contact anyone to dispute

12   the garnishment?

13      A    No.

14           MS. DEAN:  No further questions.

15           MR. HUEBER:  I have no questions.

16           (Signature was reserved.)

17           (The deposition of DANE ALAN SCOTT

18            was concluded at 10:21 a.m.)

19

20

21

22

23

24

25

1       CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE

2        IN THE FOREGOING ORAL EXAMINATION TRANSCRIPT:

3      (Note: If no changes desired, please sign and date
       where indicated below.)

4

5    PAGE        LINE                    CORRECTION AND REASON

6

7

8

9

10

11

12

13

14

15

16      I, DANE ALAN SCOTT, hereby declare under penalty of
       perjury that I have read the foregoing deposition and that

17     the testimony contained therein is a true and correct
       transcript of my testimony, noting the corrections above.

18

19

20                        _____

21                             DANE ALAN SCOTT

22                        Date: _____

23   See: Wash. Reports 34A, Rule 30(e)
          USCA 28, Rule 30(e)

24   PLEASE RETURN TO:  Central Court Reporting,
     1030 North Center Parkway, Kennewick, Washington 99336

25

b92c14b9-592b-4595-8815-d581127957bf

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON )
                         )   ss.
3    COUNTY OF BENTON    )

4        This is to certify that I, Jeri L. Chandler,

5    Registered Professional Reporter and Certified Court

6    Reporter in and for the State of Washington, residing at

7    Kennewick, reported the within and foregoing deposition;

8    said deposition being taken before me on the date herein

9    set forth; that pursuant to RCW 5.28.010 the witness was

10   first by me duly sworn; that said examination was taken by

11   me in shorthand and thereafter under my supervision

12   transcribed, and that same is a full, true and correct

13   record of the testimony of said witness, including all

14   questions, answers and objections, if any, of counsel.

15       I further certify that I am not a relative or employee

16   or attorney or counsel of any of the parties, nor am I

17   financially interested in the outcome of the cause.

18       IN WITNESS WHEREOF I have set my hand this _____ day

19   of _____, 2011.

20

                          _____
21                        JERI L. CHANDLER, RMR, RPR
                          CCR NO. 3191
22

23

24

25

b92c14b9-592b-4595-8815-d581127957bf

**A**

ability 41:22
able 45:4
absolute 30:20
acceptable 20:1
account 6:21,25 7:2
　7:18,21,25 8:4,7
　8:10 9:16,19 10:5
　10:5,17,20,23
　11:2,7,12 12:24
　13:3,3,8,10,18,20
　13:21,25 14:4,9
　14:13,15,20,20
　15:3,7,11,13,16
　15:18,21,25,25
　16:4,13,22 17:2,6
　17:10,20,21 18:6
　18:11,15 19:14,21
　19:24 20:1,4,5,10
　20:13,17,20 21:11
　25:12,19,20,24
　26:6,18,19,23
　28:2,6,12 30:14
　30:18 32:8,10,11
　32:14,22 33:2,8
　33:17,19,20,23
　34:1,8 35:1,6
　36:20,23 37:3,6
　42:18 43:23 44:2
　50:7,17 51:3
accounts 7:5,6,10
　9:1,20 42:12,16
accurate 21:7
　32:16,23 33:2,16
acquired 36:20
　37:10
action 24:18 27:4
　34:21 36:23
actions 40:16 41:14
　41:16,20
activity 14:2
added 45:3
address 4:20 9:3
　23:14
admit 30:13

adverse 41:16
adversely 41:20
affidavit 23:9,12
　27:19,21 28:1,5
　38:10
affiliated 5:9 38:1
　38:10
ago 13:6 15:15 29:5
　50:24
agree 10:7 34:10
agreement 16:18
　39:21 40:3,6
ahead 7:13 21:17
　44:13 48:23
al 1:7,9,13
Alan 1:16 3:6 4:3,8
　4:18 53:17 54:16
　54:20
altogether 7:23
ambiguity 20:8
American 32:10
amount 8:6 16:12
　16:17 18:5,21
　19:2 21:3,8 26:6
　26:22 27:1 29:23
　30:2,18 34:20
　41:25 43:7,13,18
amounts 42:22
Angeles 2:23
answer 5:25 7:13
　12:11 21:17 35:5
　43:4 44:13,15
　48:23
answers 20:3 55:14
anybody 46:16,24
apartments 12:1
appear 8:16 11:1,6
　11:10 12:23 13:2
　13:7,17 14:5,8,19
　15:10,17,24 16:21
　17:1
APPEARANCES
　2:1
appeared 8:10,14
appears 10:8 11:8
　13:5 14:14,22
　15:8,12,20 16:2

16:23 17:3 32:24
application 50:23
applied 42:8 43:22
　44:11 50:10
apply 50:11
Approximately
　4:25 29:5
April 13:24
Asheley 2:21 45:11
asheley.dean@h...
　2:25
aside 35:5 51:12
asked 24:22 28:10
　28:11 31:25
asking 16:16 39:8
　39:15
assertion 28:7
assessed 34:25
assigned 25:13
associated 43:25
Associates 1:7 3:20
　6:11
assume 44:6
attention 29:12
　30:23
attesting 23:13
attorney 5:16 31:25
　45:1 47:12,16
　49:20 55:16
attorneys 5:9,23
　6:14,16 26:12
　27:1 30:17 31:15
　40:10,23 53:5
August 9:7 10:13
　15:10
authentic 10:7,19
　11:6,11 12:23
　13:3,17,25 14:20
　15:7,10,18,24
　16:21 17:1
Avenue 2:4,10,22
　4:21,24 17:11
　23:14
award 26:14 30:16
aware 27:12 51:25
a.m 1:19 4:2 53:18

**B**

B 3:11
back 10:22 13:10
　27:18 41:9 45:14
　50:7
background 45:14
bad 33:24 41:23
balance 8:2,3 10:17
　13:10 16:7 17:23
　18:1 25:23 26:1
　26:23 28:13
bank 33:11 51:7,8
basically 43:2
basis 5:15 14:24
　17:11
Bates 23:9 25:7
　27:13 28:17 31:16
bearing 28:16
bears 31:16
belief 5:18 34:13
believe 10:3,19
　15:6 16:17 17:9
　17:19 18:4 19:9
　20:19,24 23:18,23
　26:5 29:15 30:15
　32:17,22 33:1,7
　33:16 34:1 37:13
　37:25 38:16 41:12
　41:13 44:9 48:9
　50:12 53:6
Benton 22:1,24
　29:1 43:10 55:3
best 18:22 29:13,24
　30:1,1 38:4,7 39:5
　47:18
beyond 43:18
bill 2:8 16:15
bit 35:4
bottom 25:11
Brad 2:9 5:7 41:4
bradfisher@dwt....
　2:13
break 41:5,6,12
Burger 11:5
business 12:15,20

45:23 49:22

**C**

C 55:1,1
calculation 21:7
California 2:23
call 37:13,15 38:13
　38:15 53:11
called 28:9 38:5,8
calls 17:21 21:15
　44:13 52:10
cancelled 20:16
　51:2
Capital 32:18,22
　32:25 33:4 42:19
　45:13
Capitol 1:12 2:20
　45:12 48:17,21
　49:8,13 51:12,15
　51:19,23
card 3:13 6:21,24
　7:2,5,6,10,17,21
　7:24 8:3 9:1,20
　25:20 33:20,21
　42:17 50:9,19,23
care 48:3
CARL 2:15
case 2:7,7 22:1,15
　27:10 31:15 39:1
　39:22 40:10,14
Cashatt 2:15
cause 55:17
caused 19:1
CCR 1:25 55:21
CCS/First 33:10
ceh@winstoncas...
　2:18
Center 1:20 4:2
　54:24
Central 54:24
certain 5:9 7:24
Certified 4:5 55:5
certify 55:4,15
chance 30:24 41:4
Chandler 1:25 4:4
　55:4,21

change 18:25
changed 42:11
changes 54:1,3
charge 11:5 43:24
charged 34:2
chargeoff 32:13,21
33:1,5,13,23 34:4
34:7
charges 8:9,11,14
8:16 11:14,17
13:7 14:2 16:18
43:25 44:1
Chase 33:22 34:1,4
34:7 37:10 42:19
checked 30:4
checkered 34:11
checking 30:21
31:1
checks 20:16 51:2
claim 39:19 42:23
43:7,17
claiming 40:14
43:1
claims 47:5 49:7,11
49:18,25
class 40:7 47:2,20
47:23 48:2,9
classes 45:23 46:2
clear 12:11 19:4
clearly 36:18
client 48:16
close 6:17
collect 21:10 51:24
Collection 3:14
collections 37:4
college 45:17,18,19
come 50:8
communication
37:23
communications
38:1,11,20 51:18
Community 51:9
company 30:5,21
31:2,7
complaint 23:5,13
23:16 24:1,7,15

25:3,8,22 52:15
53:3
complete 48:5
concerning 19:14
concluded 53:18
conclusion 7:12
21:16 44:13 48:19
confirmed 28:13
confused 6:10
connection 12:4
22:15 29:20 38:24
39:18 50:16,22
52:18
conscious 18:10,14
considerable 19:2
consolidated 1:6
contact 37:5,11
53:11
contained 22:20
54:17
contains 25:23
content 46:13
copies 20:13,16
23:1
copy 10:4,19 12:23
13:3,18,25 14:8
14:20 15:18,24
16:21 17:1,20
23:24 24:12 27:16
28:23 40:3
corner 22:17
correct 5:19 8:4,5,7
8:8,11 9:1,2,4,5,7
10:4 13:11,14,21
14:5,13,24 15:3,8
15:14 17:20 18:5
19:12 20:11,12,25
21:4,8,9,14 23:3
24:19,20 25:20,21
26:5,6,7,20,21,23
26:24 27:2,3,6,7
27:16 28:3,7,14
29:19,21,22 30:7
30:8,14,19 31:8
31:23 32:15 33:7
34:23 38:5,8,9

39:10,17,19,20
40:2 41:1,2,17,18
41:24 42:1,5,24
43:10,11,14 44:3
44:4 47:21,22
48:14,17 49:8,20
51:4 52:2 53:3,4
54:17 55:12
**CORRECTION**
54:5
corrections 54:17
correspondence
35:18 38:18
Costco 3:16
costs 40:25 52:18
counsel 48:18
55:14,16
County 22:1,24
29:1 43:10 55:3
couple 40:13
court 1:1 4:5 5:5
22:1 26:15 27:2,5
28:9,14 29:2,8,9
43:10 52:8 54:24
55:5
credit 2:20 3:13,15
3:17 6:21,24 7:2,5
7:6,10,17,21,24
8:3 9:1,20 14:13
16:5,18 17:7
25:20 31:20,21,24
32:1,7,7 33:20,21
34:5,11,15,18
35:3,9,19 38:21
40:20 41:17,17,20
41:23 42:8,12,17
42:20 48:21 49:16
50:1,9,19,23 51:9
52:7,10
current 4:19 51:13
**CV-09-251-EFS**
1:6 3:2
**CV-10-5132-EFS**
1:7

_____ **D** _____

**D** 2:3,3 3:1
damage 42:23
damaged 40:15
43:17
damages 40:14
41:13
Dane 1:16 3:6,18
3:20 4:3,8,18
53:17 54:16,20
date 9:6,6,8 10:10
10:23 11:4,10
12:23 13:2,17,24
14:8,19 15:5,10
15:17,21 16:14,20
16:25 17:15 18:2
37:16 54:3,22
55:8
dated 3:15,18,20
dates 7:1 46:8
Davis 2:10 5:7
day 31:22 46:18
55:18
days 24:19
dealt 46:2 49:9
Dean 2:21 3:9
45:10,11 49:2,6
53:14
debt 21:13 33:24
37:12 41:25 42:3
44:6,11,16 51:24
December 11:10
16:25 17:24 18:7
decision 18:10,14
18:18
**Declaration** 27:14
declare 54:16
deduct 12:18
deducted 12:20
43:18
default 7:8,15 24:7
24:17,21 27:14
28:20,23 43:9
defend 52:15
defendants 1:8,14
1:22 2:7,20 34:14
34:17 35:2,8

38:25 40:10,16
41:15,20 45:12
52:12
denied 42:9
deposition 1:15 4:3
8:19 22:6,13
31:13 35:16 36:7
36:14 46:5,8,10
46:17 53:17 54:16
55:7,8
**Depositions** 48:10
describe 40:15
45:15
described 48:15
describing 24:14
**Description** 3:12
descriptive 8:24
desired 54:3
determined 26:15
27:1
different 27:20
digits 9:21
discuss 47:1
discussing 41:13
discussions 46:13
disposition 33:2,8
33:17
dispute 8:15 14:2
16:12 21:1,3,6,13
34:5 41:25 44:18
53:11
disputed 28:3,7
disputing 8:9 44:9
44:19,21,24
distinction 48:20
distinguishing
49:13 50:4
**Distribution** 11:15
**DISTRICT** 1:1,2
document 9:15
10:22 23:10 25:7
27:16,24 31:12,14
35:15 36:6 39:24
40:1 47:15
documents 3:14
8:18 19:13,16,20

20:9 22:12,14,17
22:20 29:8,9 46:7
47:8,11 50:13,16
52:24
**Dodge** 11:20
**Doe** 2:7,7,8
**dollar** 43:7,12,18
**doubling** 19:2
**due** 7:20 9:6,8
10:10,23 11:4,9
12:22 13:1,16,24
14:7,19 15:5,9,17
15:21 16:4,7,13
16:20,25 17:7,8
17:15,23 18:1
**duly** 4:8 55:10
**duties** 12:5

**E**

**E** 2:15 3:1,5,11
55:1,1
**earlier** 51:1
**East** 2:4
**EASTERN** 1:2
**economics** 45:25
**education** 45:15
**effect** 41:16
**either** 6:12 27:12
**elaborate** 41:19
**employee** 55:15
**employer** 30:7
**Encore** 1:12 2:20
45:12 48:17,20
49:8,10 51:12,15
51:19,23
**engagement** 39:21
**entered** 24:8,18
29:1,7 43:9 53:8
**entities** 38:10 50:5
**entitled** 24:22
26:11
**entity** 11:14 35:19
**entry** 27:10 32:18
32:25,25 33:4,4,5
34:4,5
**equals** 41:23

**essentially** 39:14
**established** 26:4
41:24
**estimate** 30:1
**et** 1:7,9,13
**EVA** 1:9
**eventually** 29:18
**exact** 29:10
**exactly** 43:12
**examination** 1:15
3:8,9 4:14 45:9
54:2 55:10
**example** 15:1 42:3
**excess** 13:11
**excuse** 48:21
**Exhibit** 4:11 8:19
8:20,25 10:4,9
17:15 21:2 22:8
22:12,18,21 24:11
25:6 28:16 31:9
31:13,17,19 35:11
35:15,16 36:1,2,6
36:8,10,14,15,17
52:1,4
**expense** 12:13,15
**expenses** 12:15,20
**extent** 7:11 44:12
**e-mail** 51:17
**e-mails** 52:21

**F**

**F** 55:1
**fact** 23:13,23 39:12
43:2
**failed** 24:18
**fair** 6:8 19:10
**fall** 10:17 16:4
**false** 42:4
**familiar** 6:5,12
49:4
**far** 42:2,6 44:16
50:2
**favor** 29:2
**FAX** 2:5,12,18,24
**February** 13:2
**fees** 5:16,23 26:12

26:15 27:1 30:17
40:10 45:1 49:20
**fiancee** 23:20 46:25
47:1,19
**figure** 16:10 43:16
**filed** 21:12 22:2,24
38:24
**files** 22:23,24 23:2
**final** 17:15 21:2
**finance** 32:11 45:23
**financially** 55:17
**find** 19:20 20:10
29:6
**finish** 45:18
**firm** 5:9,10,12,14
5:18,21 6:1,2,4,8
6:8,15,16,16,19
6:20 37:9 38:2,5
**first** 4:8 24:10,12
25:7 28:25 30:21
55:10
**Fisher** 2:9 3:8 4:15
5:7 7:16 9:11
21:19 22:10 31:11
35:13 36:4,12
41:6,8 44:14 45:6
**five** 4:25 40:8
**Flip** 11:4
**Flipping** 10:22
**follow** 36:24
**following** 4:5 13:23
26:8 33:10
**follows** 4:9
**foregoing** 54:2,16
55:7
**FORM** 54:1
**forth** 55:9
**four** 9:21 10:1 40:8
**front** 8:20 10:11,24
15:22 17:16 25:9
27:20 28:18 33:11
36:15
**full** 4:17 55:12
**Funding** 2:20 20:21
22:25 23:6 26:25
29:2 38:18 45:12

48:21,22 49:12,13
49:19
**funds** 29:18 30:2,9
**further** 18:19 45:6
53:14 55:15

**G**

**G** 2:21
**game** 45:20,21
**garnished** 29:18,23
30:2,10 31:3
40:18 42:23,24
43:3,8,15,16,21
44:8,10 53:8
**garnishment** 52:19
53:12
**garnishments** 30:6
30:6 43:2 48:4
**general** 32:10
48:19
**Generally** 13:6
37:1
**give** 37:11
**given** 28:15 47:12
**go** 7:13 21:17 37:4
41:3 44:13 45:14
48:23
**going** 11:9 18:10,14
18:19 20:6 25:4
26:25 37:2 41:22
44:12 45:14,20
48:18 50:7 53:8
**good** 4:16 12:11
24:9
**Graduated** 45:17
**grant** 27:5
**Gray** 1:3 3:2 22:18
22:19 23:9 24:11
25:7 27:14,19
28:17 31:16,16
32:19 33:10
**Group** 1:12 2:20
45:12 48:17 49:8
51:12,15,19,23
**guess** 30:4
**Gurule** 2:7,8

**guys** 47:14

**H**

**H** 3:11
**Hammer** 2:7,8,8
5:8 6:12
**hand** 28:10 55:18
**handed** 8:18 22:11
31:12 35:14 36:5
36:13
**HAPO** 51:9
**happen** 24:14 25:4
37:2 48:4
**happened** 18:23
19:9
**harm** 35:2 41:13
43:1
**harmed** 34:14,18
40:15
**heard** 6:11 35:5
51:12
**high** 45:17
**history** 34:11 41:17
**hit** 14:12
**Hogan** 2:22
**home** 51:5
**horrible** 12:2
**HUEBER** 2:15
**Huh-uh** 20:15
35:20 38:12
**H-A-P-O** 51:11

**I**

**idea** 51:16
**identification** 4:12
22:9 31:10 35:17
36:3,11
**identified** 41:15
**identify** 13:24
**identifying** 9:15
**illegal** 19:5,9
**imagine** 50:18
**impair** 35:2
**impaired** 35:9
**improper** 19:5

43:23 44:9
inaccurate 42:4
including 55:13
inconsistent 16:17
increase 19:5 34:24
  35:6 42:17
incur 52:18
indicate 37:8
indicated 54:3
indication 37:11
individual 5:9
information 32:8
  32:11
INSTANCE 1:22
intended 37:12
interest 18:20 19:1
  34:19,24,25 35:6
  41:22 42:11
interested 20:5
  39:15 47:7 55:17
introduced 39:1
Isaac 2:8
issue 5:17 8:13
  49:21
issues 5:15
items 41:3,15

**J**

Jane 2:7,8
January 17:16
Jeri 1:25 4:4 55:4
  55:21
Jessica 23:19
job 12:2,4,16
John 2:7
judge 5:5 44:17
judgment 24:7,17
  24:21 25:5 27:10
  27:15 28:20,23,25
  29:6,13,20 43:9
  44:22,25 53:8
Judy 27:19,21
July 15:5,6
June 1:19 3:3 4:1
  14:19 15:2
jury 5:5

**K**

Karen 2:8
keep 11:9 20:13
  23:2,2
KELLI 1:3
Kennewick 1:20
  4:2,21 11:6 54:24
  55:7
kind 6:10 13:7
  33:19 36:18
Kinkley 39:2,9,22
Kirk 2:3,3
kmiller@millerla...
  2:6
know 6:2,19 13:6
  18:24 19:7 20:5
  20:22,23 30:22
  31:1,3 37:17 39:8
  42:2,6 43:4,12
  44:16 50:2 51:15
knowledge 30:10
  35:1,8,10 38:3,7
  38:14,15 47:18
  49:10 50:24 51:20
  51:23 52:11
known 23:12

**L**

L 1:25 2:7 4:4 55:4
  55:21
large 19:10
late 42:21
LAUBER 1:9
law 5:8,12,14 6:3,8
  6:15,16,16,19,20
  38:2 46:2
lawsuit 21:12,20
  22:24 25:4,12,16
  28:10 34:14 38:24
  46:24 47:9,20
  48:2 52:16,19,22
  52:25,25
lawsuits 34:22 35:7
lawyer 5:7 39:9
lawyers 6:8 22:14
  38:24 39:1,22

46:12,16,23 52:22
learning 28:25
left 16:24
left-hand 22:16
legal 4:17 5:15 7:12
  21:15 36:23 44:13
  48:19
length 17:8
letter 3:18,20 29:15
  29:16 36:14 39:2
  39:3,5,14
letters 51:21 52:9
let's 10:9 11:9
  12:22 13:1,16,23
  14:18 15:9,16
  21:11 25:6 28:16
  32:6,18 33:22
  41:3,6 42:22
level 45:15
licensed 5:19 45:5
  49:21
licensing 5:16
  49:21
lifetime 32:3
limit 14:13 16:5
  17:7
LINE 54:5
litigation 40:17
  41:1 47:24 51:13
little 8:24 35:4 42:7
live 23:21
lived 4:23
LLC 2:20
LLP 2:10
locate 47:11
located 47:15
long 4:23 6:24
  15:15
look 15:16 19:13
  20:9
looking 8:24
looks 14:12 27:20
  32:18
loop 6:17
Los 2:23
lose 40:11

Lovells 2:22
lower 22:16

**M**

M 3:5
mail 29:15 50:13
mailed 39:14
mailing 9:3
maintain 22:23,23
maintenance 12:1
  12:18
making 7:23 15:2
  18:9,14 19:1
  43:17 47:6 49:18
  49:25
Malisa 2:7
management 2:20
  3:17 31:7 35:19
  38:21 45:13 49:14
  49:16 50:1 52:7
  52:10
manager 12:1
March 13:17
Mark 2:7
marked 4:11 8:19
  22:8,12 23:8
  27:18 31:9,13
  35:11,15,24 36:2
  36:6,10,14
matter 46:21
maxing 14:15
MCM 3:19
mean 37:9 41:25
meant 19:9
mentioned 41:3
met 39:12
Michael 39:2
Midland 2:20,20
  3:17 6:5,7,20
  20:20 21:25 22:2
  22:25 23:6 26:25
  29:2 35:19,19
  36:20 37:9 38:10
  38:11,18,20 39:19
  45:12,13 48:20,21
  48:21,22 49:5,9

49:12,12,13,19,25
  50:3 52:7,10
Miller 2:3,3 7:11
  9:9 21:15 38:23
  41:4 44:12 48:18
  49:3
minimum 19:3
minutes 40:13
misunderstood
  5:25
money 8:6 12:19
  13:14 21:3 40:23
  42:23 43:2,7,21
  44:10
monthly 13:20 14:9
  14:24 16:22 17:5
  17:10,20
morning 4:16
  41:12,24
Motion 27:14
move 6:17 14:18
  15:9
Mutual 6:22 7:3,6
  7:9,9,21,24 8:3,10
  8:15 9:1,20 11:7
  11:11 12:14,24
  13:8,14,21 15:11
  15:25 17:6 18:6
  18:11,15 19:14,24
  20:4,10,20 21:11
  21:12,14 25:19
  28:2,6 30:14 35:1
  36:20 37:3,9,10
  37:14,21 42:18
  43:23 50:7,17

**N**

N 3:1,5
name 4:17 5:7
  45:11
names 6:12
need 46:9
never 21:22,24
  38:4,7 39:12
North 1:20 4:2
  54:24

note 14:11 22:16 54:3
notice 16:3 46:10 53:7
notification 3:17 35:24 52:2
noting 54:17
November 16:20
number 9:16,19 23:9 25:7 28:17 30:12 31:16 38:25 43:16 44:6
numbered 8:23 27:13
numbering 22:17
numbers 10:1
numeral 26:9

**O**

O 3:5
oath 5:2 28:11 41:10
object 44:12
objection 7:11 21:15 48:19,25
objections 48:24 55:14
obligated 7:18
obligations 7:8
obviously 43:15
October 10:23 23:14,17,24 24:2 26:18 27:9
Oh 41:6
okay 5:25 6:6 9:10 14:7 19:23 20:7 40:19 44:1,5,18 45:2 49:15
ones 42:20 47:12 47:14
one-page 36:13
ongoing 49:1
online 50:11
oral 1:15 38:1 54:2
Order 28:20
outcome 55:17

outstanding 8:3
overlimit 14:12
owe 21:1,3 30:13 44:10,17
owed 8:6 18:5 21:8 21:11,13 28:2,5 30:18 43:22 44:16
owing 16:13 26:6

**P**

page 3:7,12 8:25 10:3,9 22:18 23:8 24:11,12 25:6,7 25:11,22 27:13,18 27:20 28:17 32:7 32:19 33:10,22 34:7 54:5
paid 8:7 30:17,20 30:22 40:23,25 44:5
papers 24:4,10,25 26:17 27:8 40:8
paperwork 28:15 48:11 50:22 52:8
paragraph 24:13 25:11,22 26:8
Parkway 1:20 4:2 54:24
part 12:15
participate 48:13
particular 33:8
parties 55:16
party 21:20
pay 37:12 41:23
paycheck 53:7
paychecks 43:3,8 43:19
paying 10:16,16 40:10 42:15,17
payment 7:8 9:6 10:10,13,23 11:4 11:9 12:22 13:1 13:16,23 14:7,19 15:5,9,13,16,21 16:20,25 17:15 19:3,10 37:6 51:6

payments 7:18,20 7:23 15:2 18:11 18:15,19 19:1 20:17 37:14,22 51:3
payroll 31:4,5
pays 42:21
penalty 54:16
people 48:3
period 15:14
periodic 10:4 15:18
perjury 54:16
person 31:2 51:5
personal 11:21
PH 2:5,12,17,24
place 4:6 46:14
plaintiff 3:14 24:22 25:13 26:11
plaintiffs 1:5,10 2:2 26:14
plan 37:6
please 4:16 54:3,24
point 7:24 9:9 13:14 18:9,13 32:2 37:5 42:15
portion 28:16
positive 29:25
prepare 46:4
Pretty 48:7
pre-lawsuit 34:25
pre-legal 3:17 35:23 52:2
principal 30:18
prior 5:25 14:11 27:9 32:1 34:22 35:7
probably 21:18 28:8 37:4
proceedings 4:5 36:24
process 23:24 27:9
produce 53:5
produced 3:14 31:15
Professional 4:4 55:5

property 31:7
provided 22:14 47:16,16
provisions 40:6
purpose 44:7
purposes 19:25
pursuant 53:8 55:9
put 37:6 48:18
putting 35:5
P.S 1:7 2:3,7

**Q**

question 44:7 48:23
questions 6:18 9:14 13:24 19:25 20:6 45:6,15 53:14,15 55:14
quick 32:6

**R**

R 55:1
raise 28:10
Raised 34:19
ran 31:21
Ranch 11:5
rate 19:1,5 34:25 35:6 42:17
rates 18:20 34:19 41:22 42:11
rating 35:3
RCW 55:9
read 24:4 25:16 54:16
reading 24:13
real 24:9
really 7:14 18:24 24:9 35:17 36:25 39:7,8 43:4 46:6 47:7 49:10
reason 5:22 10:3 15:6 16:12,16 17:9,13,19 18:4 20:19,24 21:6 23:23 26:5 54:5
recall 10:16 14:15 23:5,16 24:13,24

27:8,11,24 28:25 29:16 35:18,23 36:17,19,22 38:11 38:17,20 52:2,4,6
receive 13:20 17:13 23:24 28:23 50:8 50:13,18,22 52:24 53:7
received 24:24 25:16 27:9 39:2 51:17 53:2
receiving 14:23 16:3 17:5,10 23:5 23:16 27:15,24 35:18,23 36:8,17 52:4,6,14
Recess 41:7
recognize 9:21 10:1 22:20 31:17 35:16
recollection 16:3 17:5 18:22 27:15 29:13,24 36:7 38:4 39:5 40:5
record 12:9,11 20:8 41:9 55:13
records 50:20 51:2 51:6
refer 19:24
reference 25:18,19
referring 19:25 46:10
reflected 9:3 12:14 14:3 15:1 21:2
reflecting 20:17 51:2,2
regarding 52:22
Registered 4:4 55:5
relate 47:9
related 19:20 20:9 22:24
relating 52:24
relative 55:15
remember 18:9,13 29:10
REMEMBERED 4:1

repair 11:18,19
repairs 12:13,19
repay 13:13
rephrase 35:4
report 3:15 31:20
  31:21,24 32:1,7,7
  34:5 40:20 42:20
reported 1:24 42:4
  55:7
reporter 4:4,5 8:18
  22:11 31:12 35:14
  36:5,13 55:5,6
reporting 33:23
  54:24
Reports 54:23
represent 5:8 6:16
  22:13 31:14 39:16
  39:18 45:11
representation
  28:1
representative 40:7
  47:2,20,23 48:2,9
represented 38:23
representing 51:18
request 5:23 26:14
  26:25
requested 26:22
  54:1
requests 27:5
require 20:3
reserved 53:16
residence 4:19,24
Residential 31:6
residing 55:6
respect 5:21 8:24
  21:7 25:4 36:23
respond 24:6,14
responded 24:23
response 25:2 27:4
responsibilities
  48:8
responsible 40:9
result 41:14 43:1,8
  48:20
return 52:1 54:24
returns 12:20

review 46:7
Richter 27:19,21
right 9:16 10:6
  28:10 34:12 39:7
Riverside 2:16
Riverstone 31:6
RMR 55:21
role 48:1
Roman 26:9
rough 12:3
RPR 55:21
Rule 54:23,23
run 31:24 32:1

—————————
S
S 3:5,11
Savings 33:10
saw 42:16
saying 34:21 44:1
says 22:18 27:14
  33:10
school 45:17
score 41:17,21
Scott 1:16 3:6,18
  3:20 4:3,8,16,18
  4:19 5:1 22:11
  28:12 31:12 34:10
  35:14 36:5,13
  41:9 53:17 54:16
  54:20
search 19:16 47:8
Seattle 2:11
second 24:13
section 14:3 26:12
see 9:15 10:14
  11:15 16:7,10
  17:23 25:13,24
  26:2,8,12 27:21
  28:21 32:8,11,19
  33:5,13,24 34:8
  54:23
seeing 9:8 24:24
  29:10
seen 23:10,11 24:10
  28:15 42:6,7,19
  42:20 50:14

send 52:9,21
sent 29:16
September 15:17
  16:7
sequentially 8:23
served 23:14 24:2
  26:17 27:8 52:8
service 23:9,12
set 8:18 22:11 55:9
  55:18
shorthand 55:11
showing 11:5
shows 10:13 32:13
  32:21 33:1,4,13
  33:22 34:7
sign 50:16 54:3
Signature 53:16
signed 39:24 40:1
  48:11
significantly 30:12
similarly 1:4
sit 17:4
situated 1:4
Six 11:14
smaller 37:14,22
soliciting 39:14
somewhat 19:23
  34:11
sorry 5:25 12:9,10
  49:16
sort 39:19 41:16
  48:19
sounds 12:2
speak 20:3 37:20
  46:6,12
speaking 13:7
specific 19:23
spell 51:10
spend 12:19 40:13
Spokane 2:4,17
spoken 39:12 46:23
Sprague 2:4
spring 14:16
ss 55:2
stack 14:7
stand 28:11

stapled 10:22
Stars 2:22
starts 32:8
state 4:16 5:16 22:1
  45:5 49:22 55:2,6
stated 17:23
statement 6:9 8:17
  8:25 9:4,7,18 10:5
  10:7,10,23 11:1,4
  11:6,9,11 12:14
  12:22,24 13:1,3
  13:16,18,23,25
  14:4,7,9,11,18,20
  15:2,5,7,9,11,16
  15:18,21,22,25
  16:8,14,20,22,24
  16:25 17:2,15,16
  17:20 19:11 21:2
  25:23 26:5,11
  32:23 33:2,7,16
  44:2
statements 3:13
  8:10,15,16 10:20
  13:20 17:5,10
  20:14 21:5,7
states 1:1 11:15
  26:1 28:5
steps 52:15
stipulation 48:25
stop 7:23 19:1
stopped 42:15,17
study 45:19
subject 26:19 46:21
  48:23
SUBSTANCE 54:1
substantive 40:5
sued 21:10,22,24
suffered 41:14
suggesting 19:4
suing 5:11,14,22
  6:1,2,3,7,7,19
  40:16 48:16
suit 23:6 26:20
Suite 2:11,16,23
summer 36:19 37:1
  37:18

summons 23:5,13
  23:16 24:1,7,12
  24:13 25:3 52:14
  53:2
Superior 29:1
  43:10
supervision 55:11
sure 15:15 28:24
  29:11 31:1 37:16
  39:7 40:8 41:6
  43:24 50:25 51:7
Suttell 1:7 2:7,8,8
  3:2,20 5:8,11,14
  5:18,21 6:1,2,7,10
  6:11,12,19 37:9
  38:2,5
sworn 4:8 55:10
system 23:3

—————————
T
T 2:7 3:5,5,11 55:1
  55:1
take 8:13 24:18
  27:4 32:6 36:23
  37:21 41:5,6
  45:23 46:2 48:3
  52:15
taken 1:22 4:3 22:6
  34:22 55:8,10
talk 42:22 46:16
talked 47:19
talking 40:13
tax 12:20
telephone 51:17
  52:9
tell 4:8 46:13,19
  47:5
telling 17:6 21:5
tells 16:15 24:17
  25:11
testified 4:9 51:1
testify 53:2
testifying 5:2 28:11
  41:10
testimony 5:4,4
  54:17,17 55:13

**Thank** 49:3
**Thanks** 45:7
**things** 48:4,13
**think** 12:18 17:13
  22:22 23:11,25
  29:24 30:24 37:13
**Third** 2:10
**three** 11:14 42:12
**three-page** 36:6
**Thursday** 4:1
**time** 17:8 18:9,12
  18:13 24:10 39:9
  42:13
**times** 32:3
**today** 5:2 17:4
  19:25 20:6 43:12
  46:4,9 50:14
**told** 36:19,22
**top** 9:16 32:19
**total** 29:23 30:1
**transaction** 14:3
**transcribed** 55:12
**transcript** 54:2,17
**transferred** 20:20
**Transunion** 33:23
**Tremaine** 2:10 5:8
**trials** 48:10
**tried** 37:13
**truck** 11:18,19 12:4
  12:13,19
**true** 10:4 17:19
  18:5 54:17 55:12
**truly** 49:21
**truth** 4:8,9,9
**try** 19:23 37:5
**trying** 8:13 29:11
  43:6 44:8
**turn** 10:9 12:22
  13:1,16,23 23:8
  24:11 25:6 27:13
  27:18 28:16 32:18
  33:22 47:16
**two** 7:7 16:24 29:5
  41:3,15 45:17
  50:4
**two-hole-punch**

  23:3
**two-page** 35:14

---

**U**

**Uh-huh** 9:23 11:22
  12:6 19:17 22:3
  47:4 49:24
**unaffordable** 18:20
**understand** 5:1,11
  6:3 7:14,17,18 8:2
  8:13 9:19 24:6
  26:18 29:11,12
  40:9 41:10 43:6
  44:8 45:4 48:16
  49:7
**understanding**
  5:22 6:6,18,20
  25:3 37:2 45:5
  48:1,6,12 49:11
**understood** 13:13
  25:18 26:19
**Union** 51:9
**UNITED** 1:1
**unpaid** 25:23 26:22
  37:3
**unpayable** 34:19
**unsure** 7:1 42:7
**USCA** 54:23
**use** 11:25 12:4

---

**V**

**V** 26:9
**Vaguely** 36:21
**Valentine's** 31:22
**valid** 8:11 21:13
**vehicle** 11:21
**vs** 1:6,11 3:2

---

**W**

**wages** 30:7 40:18
  44:20
**walk** 8:22 32:6
**WaMu** 3:13
**want** 40:13
**wanted** 39:18
**warden** 45:20,21

**Wash** 54:23
**Washington** 1:2,20
  2:4,11,17 4:3,21
  5:16 6:21 7:3,6,9
  7:9,21,24 8:3,10
  8:15 9:1,20 11:7
  11:11 12:14,24
  13:8,14,21 15:11
  15:25 17:6 18:6
  18:11,15 19:14,24
  20:4,10,20 21:11
  21:12,14 25:19
  28:2,6 30:13 35:1
  36:20 37:3,9,10
  37:13,21 42:18
  43:22 49:22 50:7
  50:17 54:24 55:2
  55:6
**wasn't** 20:22
**way** 20:23
**went** 18:20 19:2
  42:21
**weren't** 17:10
  18:10,18
**West** 2:16 4:21,23
  17:11
**we'll** 8:23
**we're** 8:24 19:4
  41:9
**we've** 26:4 41:24
  50:14
**whatsoever** 52:18
**WHEREOF** 55:18
**wild** 30:4
**Winston** 2:15
**witness** 7:14 9:10
  21:18 49:4 55:9
  55:13,18
**work** 11:25 31:5
  46:18
**worse** 40:20
**wouldn't** 37:21
**Wright** 2:10 5:8
**written** 38:1,17
  39:21
**wrong** 44:11

---

**X**

**X** 3:1,11

---

**Y**

**Y** 3:5
**yeah** 6:14 10:2,8
  11:8 13:12 14:14
  18:13 20:2 32:24
  33:3 34:16 35:5
  45:22 47:18
**years** 4:25 13:6
  29:5 42:12 45:17
  50:24

---

**$**

**$1,109** 33:5
**$1750** 33:1
**$2,837** 33:13
**$2200** 32:21
**$2400** 29:25 30:3
**$2700** 32:14
**$3500** 13:11
**$4,217** 10:14
**$4,809.29** 16:10
**$5,000** 51:24
**$5,208** 21:1,10
  30:13,18,25 41:25
**$5,208.19** 26:1 28:2
  28:5,13
**$5200** 43:22 44:2,5
  44:7,10,17
**$650** 30:16

---

**1**

**1** 3:13 4:11 8:19,20
  8:25,25 10:3,4,9
  17:15 21:2 24:11
**1/17/08** 12:23
**10** 1:19 3:3 10:13
**10/21/2008** 15:22
**10:21** 53:18
**1030** 1:20 4:2 54:24
**11/19/07** 11:5
**12/18/07** 12:14
**1201** 2:10
**1400** 2:23

**18** 10:23 11:10
  16:25
**19** 13:2 14:19 15:2
**1900** 2:16
**1999** 2:22

---

**2**

**2** 3:14 10:9 22:8,12
  22:18,21 24:11
  25:6 28:16 32:7
**2/14/11** 3:15
**20** 13:17 15:10
  16:20 17:16 24:19
**2004** 11:20
**2007** 9:7 10:17,24
  11:10
**2008** 13:2,17,24
  14:6,8,16,19 15:2
  15:6,10,17 16:4,7
  16:21 17:1,24
  18:7
**2009** 17:16 23:15
  23:17,24 24:2
  26:18 27:9 36:19
  37:1,18
**2011** 1:19 3:3 4:1
  31:22 55:19
**206** 2:12,12
**21** 14:8
**21st** 9:7
**211** 2:4
**22** 3:14 13:24 15:5
  15:6,17
**2200** 2:11
**24** 16:7 17:24 18:7
**27th** 4:21,23 17:11
  23:14
**28** 54:23

---

**3**

**3** 3:15 25:6,11 31:9
  31:13,17,19 32:19
**30(e)** 54:23,23
**300** 12:1
**31** 3:15
**310** 2:24,24

**3191** 1:25 55:21
**3330** 9:22 10:5 11:2
   13:4,18 14:9,21
   15:7,19 16:1,13
   17:21 18:6,16
   20:1,6 25:12,24
   28:3,6,12 42:15
   50:8 51:3
**34A** 54:23
**3405** 22:18 24:11
**3407** 25:7
**3408** 25:22
**3409** 23:9
**3410** 27:14
**3413** 27:18,21
**3426** 28:17,17
**3430** 22:18
**3431** 31:16
**3433** 32:19
**3435** 33:10
**3454** 31:16
**35** 3:17
**36** 3:18,20

_____
**4**

**4** 3:13,17 25:22
   35:11,15,16 36:1
   52:1
**4,000** 30:22
**4,000's** 42:6
**4-45** 3:8
**413-1494** 2:5
**413-1724** 2:5
**45-53** 3:9

_____
**5**

**5** 3:18 36:2,6,8 52:4
**5,000's** 42:7
**5,208.19** 18:3
**5.28.010** 55:9
**509** 2:5,5,17,18

_____
**6**

**6** 3:20 36:10,14,15
   36:17
**6/7/09** 3:18

**601** 2:16

_____
**7**

**7** 23:14,17,24 24:2
   26:18 27:9
**757-7042** 2:12
**757-8042** 2:12
**785-4600** 2:24
**785-4601** 2:24

_____
**8**

**8/12** 9:10
**8/18/09** 3:20
**8/21/07** 9:12
**811** 4:21
**838-1416** 2:18
**838-6131** 2:17

_____
**9**

**9** 4:1
**9/19/07** 10:10
**9:00** 1:19 4:2
**90067** 2:23
**98101-3045** 2:11
**99201** 2:17
**99202** 2:4
**99336** 54:24
**99337** 4:22

# Exhibit "C"

FILED

BENTON COUNTY CLERK
JOSIE DELVIN
BENTON COUNTY CLERK
KENNEWICK WA

-3426-
Gray

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

09-2-03235-9

Rcpt. Date        Acct. Date        Time
11/30/2009        11/30/2009        02:40 PM

Receipt/Item #        Tran-Code        Docket-Code
2009-01-14616/02      1597
Cashier: SLB

Paid By: suttell & associates, atty
Transaction Amount:                $30.00

JOSIE DELVIN
BENTON COUNTY CLERK
DEC 03 2009
FILED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

Midland Funding LLC

Plaintiff,

vs.

DANE SCOTT

Defendant(s).

NO. 09-2-03235-9

ORDER OF DEFAULT JUDGMENT
(Clerk's Action Required)

JUDGMENT SUMMARY
s/a 21850.001

JUDGMENT DOCKET MR-1402 183-S

1. Judgment Creditor:        Midland Funding LLC
2. Judgment Debtor:          DANE SCOTT
3. Principal:                $   5208.19
4. Interest to 11/19/2009    $      0.00
5. Costs:                    $    309.50
6. Plaintiff's attorney fees $    650.00
7. Total Judgment:           $   6167.69
8. Interest Rate:                12.0000%
9. Attorneys for Plaintiff: SUTTELL & HAMMER, P.S.

THIS MATTER having come on regularly before the undersigned Judge of the above entitled Court upon the plaintiff's Motion for Default and Judgment against the defendant and the plaintiff being represented by its attorney, Suttell & Hammer, and the defendant having failed to appear or file an Answer herein and more than twenty (20) days having elapsed since the date of service of the Summons and Complaint herein,

SUTTELL & HAMMER, P.S.
(formerly known as Suttell & Associates, P.S.)
1450-114TH AVE SE, #240
CONIFER BUILDING
BELLEVUE, WA 98004
425-455-8220/425-454-7884 Fax

1  and the Court being otherwise fully advised in the premises, NOW, THEREFORE, it is

2  hereby

3      ORDERED, ADJUDGED, AND DECREED that the defendant, DANE SCOTT, is

4  hereby in default.

5      IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiff shall

6  have judgment against the defendant, DANE SCOTT, as set forth in the Judgment Summary

7  herein.

8      ENTERED this 3rd day of December, 2009.

9

10

11                                    _____
                                     Judge/Court Commissioner

12

13  Presented by:

14  SUTTELL & HAMMER, P.S.
    *(Formerly known as Suttell & Associates, P.S.)*

15

16  _____
    ( ) William G. Suttell, WSBA #12424
17  ( ) Patrick J. Layman, WSBA #5707
    ( ) Karen L. Hammer, WSBA #35608
18  ( ) Isaac Hammer, WSBA #36101
    ( ) Mark T. Case, WSBA #38589
19  ( ) Malisa L. Gurule, WSBA #40602
    ( ) Nicholas R. Filer, WSBA #39536
20  Attorneys for Plaintiff
    s/a 218550.001

21

22

23

24

25

SUTTELL & HAMMER, P.S.
*(Formerly known as Suttell & Associates, P.S.)*
1450-114TH AVE SE, #240
CONIFER BUILDING
BELLEVUE, WA, 98004
425-455-8220/425-454-7884 FAX

-3427-
Gray

RECEIVED

FEB 0 1 2010

PAYROLL

JOSIE DELVIN
BENTON COUNTY CLERK

JAN 2 0 2010

FILED

Emailed
Personal

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

Midland Funding LLC

Plaintiff,

vs.

DANE SCOTT

Defendant,

Riverstone Operating Company, Inc.,

Garnishee Defendant.

NO. 09-2-03235-9

WRIT OF GARNISHMENT
CONTINUING LIEN OF EARNINGS

s/a 218550.001

This garnishment: _____ is XXX is not based on judgment or court order for child support.

THE STATE OF WASHINGTON TO:
   Garnishee Defendant; Riverstone Operating Company, Inc.

AND TO:
   DANE SCOTT, Defendant, Social Security No. ***-**-6824

The above-named plaintiff has applied for Writ of Garnishment against you, claiming that the above-named defendant is indebted to plaintiff and that the amount to be held to satisfy that indebtedness is:

| | |
|---|---|
| Balance on Judgment, plus post-judgment costs, Attorneys fees, and interest to January 7, 2010, less payments received: | $6227.62 |
| Estimated Garnishment Costs: | |
| Service and Affidavit Fees | $ 30.00 |
| Postage and costs of Certified Mail | $ 7.00 |
| Answer Fee or Fees (if applicable) | $ |
| Garnishment Attorney fee | $ 250.00 |

SUTTELL & HAMMER, P.S.
(Formerly known as Suttell & Associates, P.S.)
1450-114TH AVE SE, #240
CONIFER BUILDING
BELLEVUE, WA, 98004
425-455-8220/425-454-7884 Fax

5

-3428-
Gray

| | | |
|---|---|---|
| Clerk Issuance Fee | $ | 20.00 |
| Other | $ | |
| **TOTAL:** | $ | 6534.62 |

YOU ARE HEREBY COMMANDED, unless otherwise directed by the court, by the attorney of record for the plaintiff, or by this writ, not to pay any debt, whether earnings subject to this garnishment or any other debt, owed to the defendant at the time this writ was served and not to deliver, sell, or transfer, or recognize any sale or transfer of, any personal property or effects of the defendant in your possession or control at the time when this writ was served. Any such payment, delivery, sale, or transfer is void to the extent necessary to satisfy the plaintiff's claim and costs for this writ with interest.

YOU ARE FURTHER COMMANDED to answer this writ by filling in the attached form according to the instructions in this writ and in the answer forms and, within twenty days after the service of the writ upon you, to mail or deliver the original of such answer to the court, one copy to the plaintiff or the plaintiff's attorney, and one copy to the defendant, in the envelopes provided.

If, at the time this writ was served, you owed the defendant any earnings (that is wages, salary, commission, bonus, or other compensation for personal services or any periodic payments pursuant to a nongovernmental pension or retirement program), the defendant is entitled to receive amounts that are exempt from garnishment under federal and state law. You must pay the exempt amounts to the defendant on the day you would customarily pay the compensation or other periodic payment. As more fully explained in the answer, the basic exempt amount is the greater of seventy-five percent of disposable earnings or a minimum amount determined by reference to the employee's pay period, to be calculated as provided in the answer. However, if this writ carries a statement in the heading that "This garnishment is based on a judgment or court order for child support," the basic exempt amount is forty percent of disposable earnings.

IF THIS IS A WRIT FOR A CONTINUING LIEN ON EARNINGS, YOU MAY DEDUCT A PROCESSING FEE FROM THE REMAINDER OF THE EMPLOYEE'S EARNINGS AFTER WITHHOLDING UNDER THIS WRIT. THE PROCESSING FEE MAY NOT EXCEED TWENTY DOLLARS FOR THE FIRST ANSWER AND TEN DOLLARS AT THE TIME YOU SUBMIT THE SECOND ANSWER.

If you owe the defendant a debt payable in money in excess of the amount set forth in the first paragraph of this writ, hold only the amount set forth in the first paragraph and release all additional funds or property to defendant.

IF YOU FAIL TO ANSWER THIS WRIT AS COMMANDED, A JUDGMENT MAY BE ENTERED AGAINST YOU FOR THE FULL AMOUNT OF THE PLAINTIFF'S CLAIM AGAINST THE DEFENDANT WITH ACCRUING INTEREST, ATTORNEY FEES, AND COSTS WHETHER OR NOT YOU OWE ANYTHING TO THE DEFENDANT. IF YOU PROPERLY ANSWER THIS WRIT,

SUTTELL & HAMMER, P.S.
*(Formerly known as Suttell & Associates, P.S.)*
1450-114TH AVE SE, #240
CONIFER BUILDING
BELLEVUE, WA. 98004
425-455-8220 /425-454-7884 FAX

6

-3429-
Gray

ANY JUDGMENT AGAINST YOU WILL NOT EXCEED THE AMOUNT OF ANY NONEXEMPT DEBT OR THE VALUE OF ANY NONEXEMPT PROPERTY OR EFFECT IN YOUR POSSESSION OR CONTROL.

THIS IS A WRIT FOR A CONTINUING LIEN. THE GARNISHEE SHALL HOLD the nonexempt portion of the defendant's earnings due at the time of service of this writ and shall also hold the defendant's nonexempt earnings that accrue through the last payroll period ending on or before SIXTY days after the date of service of this writ. HOWEVER, IF THE GARNISHEE IS PRESENTLY HOLDING THE NONEXEMPT PORTION OF THE DEFENDANT'S EARNINGS UNDER A PREVIOUSLY SERVED WRIT FOR A CONTINUING LIEN, THE GARNISHEE SHALL HOLD UNDER THIS WRIT only the defendant's nonexempt earnings that accrue from the date the previously served writ or writs terminate and through the last payroll period ending on or before sixty days after the date of termination of the previous writ or writs. IN EITHER CASE, THE GARNISHEE SHALL STOP WITHHOLDING WHEN THE SUM WITHHELD EQUALS THE AMOUNT STATED IN THIS WRIT OF GARNISHMENT."

JUDGMENT MAY ALSO BE ENTERED AGAINST THE DEFENDANT FOR COSTS AND FEES INCURRED BY THE PLAINTIFF.

Witness, the Honorable **ROBERT G. SWISHER** Judge of the above-entitled Court and the seal thereof, this 20 day of January, 2009 2010

**JOSIE DELVIN**
Clerk of the Court

By: **ELAINE OSBORNE**
Deputy Clerk
7122 West Okanogan Pl, Box #C
Kennewick WA 99336

SUTTELL & HAMMER, P.S.
*(Formerly known as Suttell & Associates, P.S.)*

( ) William G. Suttell, WSBA #12424
(✔) Patrick J. Layman, WSBA #5707
( ) Karen L. Hammer, WSBA #35608
( ) Isaac L. Hammer, WSBA #35101
( ) Mark T. Case, WSBA #38589
( ) Malisa L. Gurule, WSBA #40602
( ) Nicholas R. Filer, WSBA #3953
( ) Steven J. Contos, WSBA #37102
Attorneys for Plaintiff
1450 – 114th Avenue SE, Suite 240
BELLEVUE, WA 98004/425-455-8220

SUTTELL & HAMMER, P.S.
*(Formerly known as Suttell & Associates, P.S.)*
1450–114TH AVE SE, #240
CONIFER BUILDING
BELLEVUE, WA, 98004
425-455-8220/425-454-7884 Fax

7

-3430-
Gray